J-S31044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.R., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 280 WDA 2019 |

Appeal from the Order Entered January 16, 2019
In the Court of Common Pleas of Lawrence County Orphans' Court at
No(s):  20011 of 2017, 0C -A,
CP-37-DP-0000095-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.R., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 281 WDA 2019 |

Appeal from the Order Entered January 16, 2019
In the Court of Common Pleas of Lawrence County Orphans' Court at
No(s):  94 of 2013, DP, 20012 of 2017,

BEFORE:  OLSON, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED AUGUST 06, 2019**

M.R. ("Mother") appeals from the order terminating her parental rights to K.M.R. and J.A. ("Children"). We conclude the trial court did not abuse its discretion and, therefore, affirm.

The trial court set forth the factual and procedural history, which we adopt and incorporate herein. ***See*** Trial Court Pa.R.A.P. 1925(a) Opinion, filed Mar. 6, 2019, at 1-3; Trial Court Opinion, filed January 16, 2019, at 1-24.

By way of background, K.M.R. (d.o.b. November 6, 2001) and J.A. (d.o.b. January 18, 2006) are the daughters of Mother and C.A. ("Father").[1] Children were first adjudicated dependent in November 2013. Prior to that, Children had been living with Mother in a trailer on maternal grandfather's property. Father was intermittently present in the household but perpetrated recurring acts of domestic violence against both Mother and K.M.R., fueled by his heavy use of alcohol and drugs. On November 2, 2013, Father's severe beating of Mother, which required Mother to be flown via helicopter to Pittsburgh for medical treatment, lead to the emergency removal of the Children from the household. Children witnessed Father's attack on Mother and ran to get help. When the Pennsylvania State Police responded to Mother's residence, they observed deplorable and unsanitary conditions.

The Children have been in foster care since their initial dependency adjudication in 2013, and have remained with the same foster parents, who are an adoptive resource for the Children. The trial court conducted numerous

---

\* Retired Senior Judge assigned to the Superior Court.

[1] Father has also filed an appeal in this Court (docketed in this Court at 282 and 283 WDA 2019) regarding Children.

permanency review hearings and issued the last permanency review order on September 17, 2018.[2] In the interim, in April 2017, Children and Youth Services ("CYS") filed motions to change Children's goal from reunification to adoption and to terminate the parental rights of Mother and Father. Over a 16-month period, the trial court conducted multiple hearings regarding termination/goal change at which Children's therapist, counselor, psychologist, and CYS caseworkers testified. The trial court also heard testimony from Mother, Father, and K.M.R.

Ultimately, the trial court concluded that CYS had established, by clear and convincing evidence, that grounds for termination of Mother's rights existed and, on January 16, 2019, issued an order terminating Mother's parental rights with a comprehensive opinion in support thereof. Mother filed a timely Notice of Appeal and Pa.R.A.P. 1925(b) statement and the trial court submitted a Pa.R.A.P. 1925(a) opinion.

Mother raises the following issues on appeal:

> 1. Whether the Children and Youth Services Agency (Agency) failed to make children available to the Court as required and as mandated by the Child Protective Services Laws (CPSL)[?]

___

[2] We note that Mother filed an appeal from the September 17, 2018 dependency order. *In re Interest of J.A./K.R.*, 1451 WDA 2018, 1452 WDA 2018. In light of the instant appeal, Mother's dependency appeal was continued for consideration with this appeal. Here, we affirm the termination of Mother's parental rights, therefore Mother's challenges to the dependency proceedings have been rendered moot. We therefore will not address them further. *See* Order, 1451 WDA 2018, 1452 WDA 2018.

2. Whether the Court erred in determining that although [Mother] had exceeded what was requested of her and then determined that, although she completed all services required by the Agency, the Court failed to apply the law to the facts of the case and return [Children] to [Mother][?]

3. Whether the Agency failed to provide any type of reunification counseling or generate a service plan to reunify [Children] with [Mother][?] The agency withheld [Children] and appropriate reunification services after all other required services were completed by [Mother]. The Court failed to apply the law to the facts on this matter.

4. Whether the Agency failed to provide visits between [Mother] and Children, based solely on the alleged belief that one of the two Children voiced her desire to not see [Mother][?] The agency failed to provide competent evidence that there was any basis to deny Mother visitation. The Court failed to apply the law to the facts on this matter.

5. Whether the Court failed to take testimony from [Children] regarding their individual desire to reunify with [Mother] thereby requiring the Court to decide as to [Children] based upon the unsubstantiated testimony of one child, while the other was withheld from the Court without justification[?]

6. Whether the Agency failed to provide any competent testimony that the best interests of [Children] were served by termination of parental rights[?]

7. The Court failed to find that the Agency had provided any competent testimony that [Children] were bonded with the foster family or that they did not have a bond with Mother. In fact, the Court was incapable of making any determination about the child who was never presented for testimony or evaluation by the Court.

8. Whether the Court erred by issuing a final order on the Involuntary Termination rather [than] staying the matter pending the outcome [of] the Superior Court Dependency Appeal in this case[?]

9. Whether the evidence was sufficient to determine that Mother suffered from an incapacity that she could not overcome and permit [Children] to return home[?]

10. Whether the Court misconstrued the testimony of the expert psychologist, Dr. Gallo, by claiming that he was not qualified to render an opinion on Mother's parental capacity when, indeed, his testimony was that Mother had no apparent impediments to her capacity to parent[?]

11. Whether the Court erred in determining that Mother failed to complete a second parental capacity evaluation when the record indicated that she did and that the Agency refused to accept the second evaluation because it was done by an independent provider[?]

Mother's Br. at vi-vii.

When reviewing orders terminating parental rights, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). If the record supports those findings, we then review the decision "to determine if the trial court made an error of law or abused its discretion." *Id.* We will reverse a decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*

The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion standard to termination decisions:

[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (citations omitted).

A trial court may terminate parental rights only after finding grounds for termination existed under Section 2511(a) and that termination is in the child's best interest under Section 2511(b). Here, we conclude that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2).[3]

Section 2511(a)(2) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence of the following: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without

_____

[3] We note that CYS also sought to terminate Mother's parental rights pursuant to subsection (a)(8). However, the trial court specifically found that Mother's rights could not be terminated under that subsection because Mother had successfully remedied the physical conditions which initially triggered Children's removal from her care.

essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa.Super. 2003).

If the trial court has concluded that a parent's parental rights should be terminated under Section 2511(a), then the court must determine whether, considering the child's developmental, physical, and emotional needs and welfare, termination is in the best interests of the child. 23 Pa.C.S.A. § 2511(b); **S.P.**, 47 A.3d at 830. In conducting this analysis, the court should examine the emotional bond between parent and child, with close attention to the effect on the child of permanently severing any such bond.

For ease of disposition, we will address Mother's issues grouped by the overarching issues they address, as the trial court did in its Rule 1925(a) opinion. In both her first and fifth issue, the crux of Mother's arguments lie in her contention that CYS did not properly provide the testimony of both Children. In particular, Mother points out that J.A. never testified during the termination proceedings at all and K.M.R. did not testify during the most recent proceedings.

Mother's first and fifth issues lack merit. "[T]he admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." **In re R.T.**, 778 A.2d 670, 683 (Pa.Super. 2001) (internal quotation marks and citation omitted).

Currently, this Court does not mandate that "an abused or neglected child [be forced by his or her natural parent] to testify in an involuntary termination proceeding." *In re B.L.L.*, 787 A.2d 1007, 1011 (Pa.Super. 2001) (citation omitted). Accordingly, we conclude that the trial court did not abuse its discretion by determining that good reason excused Children's testimony where Children's legal counsel was present. *See* Trial Court's Rule 1925(a) Opinion at 8-11. Moreover, as detailed below, even in the absence of J.A.'s testimony, we conclude that the trial court had sufficient evidence to support the termination of Mother's parental rights.

In her second, sixth, seventh, ninth, and tenth issues, Mother presents the overarching argument that the evidence was insufficient to terminate her parental rights pursuant to either Section 2511(a)(2) or Section 2511(b). She specifically cites to her successful efforts at remedying her home and her general compliance with her family service plan ("FSP"). She also points to the testimony of her expert, Dr. Gallo, who testified that Mother had no apparent impediments to her ability to parent Children.

However, the trial court concluded that ample evidence supported the termination of Mother's parental rights under Section 2511(a)(2) because the testimony of both fact and expert witnesses at trial established that Mother has "extreme and sustained difficulties in emotionally relating to children." Trial Court Rule 1925(a) Opinion at 14. The trial court also noted a "notice/demand" letter Mother sent to the court wherein she demands the

return of her "property," *i.e.* Children. **See id.** Further, the court properly emphasized that ample evidence supported the conclusion that Children's interests would be best served by the termination of Mother's parental rights, as required under Section 2511(b). **Id.** at 13-15. To this end, the court explained that multiple witnesses detailed Children's toxic bond with both Mother and Father and Children's strong desire to remain with their foster parents who are an adoptive resource for Children. **Id.** Further, the trial court aptly addressed Mother's contention regarding the weight accorded to her expert, Dr. Gallo, by noting that Dr. Gallo had never observed Mother interact with Children. **Id.** According, we conclude that the trial court properly determined that sufficient evidence supported the termination of Mother's parental rights under Sections 2511(a)(2) & (b) and affirm on the basis of the court's thorough reasoning. **See** Trial Court's Rule 1925(a) Opinion at 12-15; Trial Court's January 16, 2019 Opinion at 31-38.

Turning to her third and fourth issues on appeal, Mother claims that CYS failed to make reasonable efforts to reunify the family by ceasing to require Children to visit with her. She argues that Children's desire to stop her visitation was not a sufficient reason to halt all visits. In support, she points to case law that requires the opportunity for visitation absent a severe threat to the child at issue. **See In re C.J.**, 729 A.2d 89, 94 (Pa.Super. 1999) (stating that as long as a child's goal remains reunification, visitation should continue unless a grave threat to the child exists).

However, the trial court properly explained that Mother's visitation with Children was stopped due to Mother's own alleged misconduct during visits and the attendant self-destructive and self-harming behavior specifically reported by K.M.R. **See** Trial Court's Rule 1925(a) Opinion at 20. We conclude that the trial court permissibly declined to force Children to continue visitation under such circumstances, and affirm pursuant to the trial court's reasoning.

As referenced above, Mother also appealed the trial court's September 17, 2018 dependency order. However, the trial court declined to stay the instant termination proceedings in light thereof. In her eighth issue, Mother contends that the trial court's denial of her Motion to Stay constituted an abuse of discretion because many issues she intended to raise in the dependency appeal could prove dispositive for termination/goal change proceedings. In response, the trial court cited authorities, *inter alia*, Pa.R.A.P. 1701(c), for the proposition that proceedings should only be stayed pending appeal when the same claims are at issue in both the appellate and trial court proceedings. Here, the termination/goal change proceedings concerned different issues than those relevant to the dependency proceedings. Therefore, we concur with the trial court's decision to dismiss Mother's bid to stay the termination/goal change proceedings. **See** Trial Court's Rule 1925(a) Opinion at 26-27.

Pursuant to the foregoing, and after reviewing the trial court's comprehensive opinions, the record, the parties' briefs, and relevant law, we see no abuse of discretion or error of law. Accordingly, we affirm based on the

well-reasoned opinions of the Honorable John W. Hodge, which we adopt and incorporate herein.

Order affirmed.

Judge Stabile joins the memorandum.

Judge Olson concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/6/2019

IN THE INTEREST OF: : IN THE COURT OF COMMON PLEAS

: LAWRENCE COUNTY, PENNSYLVANIA

K.M.R. : NO. 94 OF 2013, DP;
NO. 20012 of 2017, OC-A

J.L.A. : NO. 95 OF 2013, DP;
NO. 20011 of 2 017, OC-A

## OPINION

Hodge, J. March 6, 2019

Presently before the Superior Court are the appeals of M.R. (Mother) and

C.A. (Father) (collectively, Parents), the natural parents of K.M.R. and J.L.A.

(Children), to this Court's Order of January 16, 2019, granting Lawrence County

Children and Youth Services' (CYS) Petitions for Involuntary Terminations of Parental

Rights and Motions for Goal Change from reunification to adoption. For the reasons

set forth in this opinion, issued pursuant to Pa. R.A.P. 1925(a), we respectfully request

that the Superior Court affirm our Order and dismiss this appeal.

## PROCEDURAL HISTORY

The procedural history of these cases, which ultimately stretches back to

November 2013, is recounted in more detail in the Opinion attached to the January 16,

2019 Order of Court, which we incorporate herein by reference and for continuity's

sake republish below:

Children were first taken into emergency care by an order of this Court dated
November 4, 2013. CYS then filed a dependency petition on November 18,
2013, and three days later, this Court adjudicated both Children dependent,
pursuant to the Juvenile Act (42 Pa. C.S. §§6301 et seq.), based on evidence

2019 MAR -5 PM 1: 47



presented that Father had physically assaulted Mother with Children present and that Mother's home had deplorable conditions. Accordingly, by dispositional order dated January 5, 2014, this Court assigned legal and physical custody of Children to CYS. Since the initial dependency finding, this Court has conducted permanency review hearings approximately every six months as required by the Juvenile Act and has continued to find Children dependent, and their placement in foster care appropriate, as documented by each permanency review order to date and including the most recent one issued on September 17, 2018.[1]

Following several years of dependency hearings, CYS presented the Motions for Goal Change and Termination Petitions on April 11, 2017, alleging that Mother's and Father's parental rights should be terminated pursuant to 23 Pa. C.S. §2511(a)(2) and (8). This Court conducted the following hearings, and the following witnesses testified, over a sixteen-month period and formed the bulk of the factual record underlying this opinion:

1. August 8 and 9, 2017; K.M.R. and therapist Tanya Stahlman;
2. September 26, 2017; Ms. Stahlman (continued) and counselor Brian Dick;
3. March 28 and 29, 2018; psychologist Dr. Fred Gallo and CYS caseworker Amber Pieri;
4. June 26, 2018; Ms. Pieri (continued) and testimony from Father and Mother;
5. August 27, 2018; CYS caseworker Kristen Pauline.

Besides the considerable evidence accumulated at these hearings, all parties stipulated at the first hearing (August 8, 2017) to incorporate the factual record of the dependency cases into the record of the Termination Petitions and Goal Change Motions. Following the close of evidence on August 27, 2018, this Court permitted all parties to file proposed findings of fact and conclusions of law, which were received by October 31, 2018.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

---

[1] Mother timely appealed these permanency review orders to the Superior Court on October 5, 2018, which are currently docketed at 1451 and 1452 WDA 2018 (hereinafter, Dependency Appeals).

2018 MAR -5 PM 1: 47          2

On January 16, 2019, upon consideration of the parties' submissions, applicable law, and the evidentiary record, this Court issued an Opinion with findings of fact and conclusions of law in support of the Order granting CYS' Termination Petitions and Motions for Goal Change. Once again, those findings of fact and conclusions of law, as set forth in the January 16, 2019 Opinion and Order of Court, are incorporated herein by reference. On February 14, 2019, Mother and Father each filed timely notices of appeal and concise statements of matters complained of on appeal.

## MATTERS COMPLAINED OF ON APPEAL

Both Mother and Father have filed timely Notices of Appeal and Concise Statements of Matters Complained of on Appeal. The issues they complain of are as follows:

### A. Mother

1. Whether the Children and Youth Services Agency [CYS] failed to make [Children] available to the Court as required and mandated by the Child Protective Services Laws (CPSL).

2. Whether the Court erred in determining that [Mother] had exceeded what was requested of her and then determined that [Mother], although she completed all services required by [CYS], and thereby, the Court failed to apply the law to the facts of the case and return [Children] to the mother.

3. Whether [CYS] failed to provide any type of reunification counseling or generate a service plan to reunify [Children] with [Mother]. [CYS] withheld the children

53RD
JUDICIAL
DISTRICT

\WRENCE COUNTY
PENNSYLVANIA

2019 MAR -6 PM 1: 47

3

and appropriate reunification services after all other required services were completed by [Mother]. The Court failed to apply the law to the facts on this matter.

4. Whether [CYS] failed to provide visits between [Mother] and children, based solely on the alleged belief that one of the two children voiced her desire to not see [Mother]. [CYS] failed to provide competent evidence that there was any basis to deny mother visitation. The Court failed to apply the law to the facts on this matter.

5. Whether the Court failed to take testimony from both children regarding their individual desire to reunify with [Mother] thereby requiring the Court to make a decision as to both children based upon the unsubstantiated testimony of one child, while the other was withheld from the Court without justification.

6. Whether [CYS] failed to provide any competent testimony that the best interests of the children were served by termination of parental rights.

7. The Court failed to find [CYS] had provided any competent testimony that the children were bonded with the foster family or that they did not have a bond with mother. In fact, the Court was incapable of making any determination about the child who was never presented for testimony or evaluation by the Court.

8. Whether the Court erred by issuing a final order on the Involuntary Termination rather than staying the matter pending the outcome of the Superior Court Dependency Appeal in this case.

9. Whether the evidence was sufficient to determine that mother suffered from an incapacity that could not overcome and permit the children to return home.

10. Whether the Court misconstrued the testimony of the expert psychologist, Dr. Gallo, by claiming that he was not qualified to render an opinion on mother's

parental capacity when, indeed, the testimony was that mother had no apparent impediments to her capacity to parent.

11. Whether the Court erred in determining that mother failed to complete a second parental capacity evaluation where the record indicated that she did and that [CYS] refused to accept the second evaluation because it was done by an independent provider.

## B. Father

1. Whether [CYS] failed to make children available to the Court as required and mandated by the Child Protective Services Laws (CPSL).

2. Whether the Court failed to apply the law to the facts of the case and return the children to the father.

3. Whether [CYS] failed to provide any type of reunification counseling or generate a service plan to reunify the children with [Father]. [CYS] withheld the children and appropriate reunification services in an attempt to reunify the children with father, pursuant to the original goals of the Family Service Plan. The Court failed to apply the law to the facts on this matter.

4. Whether [CYS] failed to provide visits between [Father] and children to allow them to develop and foster a relationship with [Father] following his release from incarceration. [CYS] failed to provide competent evidence that there was any basis to refuse or otherwise deny father visitation. The Court failed to apply the law to the facts on this matter.

5. Whether the Court failed to take testimony from both children regarding their individual desire to reunify with [Father] thereby requiring the Court to make a

2018 MAR -5 PM 1: 47

5

decision as to both children based upon the unsubstantiated testimony of one child, while the other was withheld from the Court without justification.

6. Whether [CYS] failed to provide any competent testimony that the best interests of the children were served by termination of parental rights.

7. The Court failed to find that [CYS] had provided any competent testimony that the children were bonded with the foster family or that they did not have a bond with father. In fact, the Court was incapable of making any determination about the child who was never presented for testimony or evaluation by the Court.

8. Whether the Court erred by issuing a final order on the Involuntary Terminations rather than staying the matter pending the outcome of the Superior Court Dependency Appeal filed by mother in this case.

9. Whether the Court committed reversible error by determining that he was not capable of proper parenting when, in fact, he was never subject to the parental capacity examination to determine his fitness to properly parent the children.

10. Whether the Court committed reversible error by finding that Petitioner failed to timely complete the requirements established by his family service plan when the lack of services made it impossible for [Father] to comply. Specifically, while [Father] was required to complete a batterer's program, no such program was available through any service agency in Lawrence County and, therefore, the failure to complete this program was beyond [Father's] control and should not serve as a basis for the termination of his parental rights.

While Mother and Father each raise some unique questions on appeal, generally their Concise Statements feature many similar or outright identical issues.

: f\i.(''; 'Cí?íüï\'.ÁL

Accordingly, for purposes of this Opinion, Mother's and Father's issues will be organized and divided into the following five categories of analysis:

- I: Failure to Have Children Appear in Court or Take Their Testimony (Mother's and Father's points 1 and 5).

- II: Lack of Competent Testimony or Other Evidentiary Issues (Mother's and Father's 6 and 7; Mother's 9 and 10).

- III: Issues with the Reunification Plan or Provision of its Services (Mother's 3,4 and 11; Father's 3,4,9 and 10).

- IV: Failure to Apply the Applicable Law (Mother's and Father's 2).

- V: Failure to Stay Termination Pending Dependency Appeals (Mother's and Father's 8).

## DISCUSSION

Our Supreme Court has set forth the appellate standard of review in termination of parental rights cases as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

2019 MAR -6 PH 1: 47

7

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013).

Appellate courts review goal change orders in an identical matter by also employing an abuse of discretion standard. In re R.M.G., 997 A.2d 339, 345 (Pa. Super. 2010).

### I. Failure to Have Children Appear in Court or Take Their Testimony

In each of their respective concise statements at Nos. 1 and 5, both Mother and Father contend that CYS failed to make Children available to this Court as required by the Child Protective Services Laws and that this Court erred by failing to take testimony from both Children regarding their individual wishes for reunification. With respect to the Child Protective Services Laws (CPSL) that Mother and Father both cite, Mother and Father are correct that there is a body of law known in this Commonwealth under that name. 23 Pa. C.S. §§6301-6386. However, these statutes are not generally concerned with dependency and termination cases but rather have a purpose described by the Supreme Court as follows:

> The legislature sought to encourage greater reporting of suspected child abuse in order to prevent further abuse and to provide rehabilitative services for abused children and their families. The [CPSL] also establishes a statewide central registry for the maintenance of indicated and founded reports of child abuse, as identifying perpetrators of abuse serves to further protect children. Recognizing that identifying someone as a child abuser can profoundly impact that person's reputation, the release of such information is advocated only in certain limited venues. [Reports] of indicated and founded abuse identifying the perpetrator can be released to law enforcement, social work agencies, employers in child care services and other related venues.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

2016 MAR -6 PM 1: 47

8

<u>G.V. v. Department of Public Welfare</u>, 91 A.3d 667, 670-71 (Pa. 2014) (quoting <u>P.R. v. Department of Public Welfare</u>, 801 A.2d 478, 483 (Pa. 2002)).

Indeed, the statute itself uses nearly identical language in expressing its purpose to "encourage more complete reporting of suspected child abuse" and to enhance the capability of each county to investigate and prosecute suspected abusers while protecting and rehabilitating affected children. 23 Pa. C.S. §6302(b). While there are some intersections between the CPSL and dependency/termination issues, those connections are irrelevant to the case at bar. *See, e.g.* 23 Pa. C.S. §§6339, 6341(d), 6375(k). Moreover, the only section directly dealing with evidentiary issues, 23 Pa. C.S. §6381, has clear language that does not specify any requirement that children must be made available to the Court by a child services agency, and we will not read such a provision into the law at this time. *See* 1 Pa. C.S. §1921(b). In short, there is simply no applicable mandate in the CPSL regarding making children available to the court to which CYS failed to adhere at the termination/dependency proceedings.

Because this case is a blend of dependency and termination issues, it is appropriate to evaluate the rules each of these types of proceedings has regarding the presence and testimony of the children involved. For dependency proceedings, the starting point is Pa. R.J.C.P. 1128(A), which states that generally "all parties shall be present at any proceeding" unless certain exceptions apply. Among those exceptions is that "the court may proceed in the absence of a party upon good cause shown except that in no case shall a hearing occur in the absence of a child's attorney. If a child has a guardian ad litem and legal counsel, both attorneys shall be present." Pa.

2019 MAR -6 PM 1: 47

9

R.J.C.P. 1128(B)(1). After first reiterating that a proceeding is never to move forward "in the absence of the child's attorney," the comment to the rule further explains that while "a child should appear in court" unless good cause is shown, it is up to the court's discretion whether to proceed "if the court finds that a party has received proper notice of the hearing and has willfully failed to appear." Pa. R.J.C.P. 1128 cmt. In short, Pa. R.J.C.P. 1128 imposes a general requirement that all parties to a dependency case should be present for all proceedings but also permits absences for good cause that are left to the court's discretion.

Also pertinent to dependency hearings are several provisions of the Juvenile Act. 42 Pa. C.S. §6351(e)(1) (emphasis added) states that:

> In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan *have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem...*

The court is also required to consult with the affected child as to his/her desired permanency goal in the very narrow circumstance that the court orders the child to be placed into another planned permanent living arrangement. 42 Pa. C.S. §6351(f.1)(5)(iv). Lastly, the Juvenile Act provides that "[upon] the application of [any party to dependency proceedings], the court, master, or the clerk of court shall issue, or the court or master may on its own motion issue, subpoenas requiring the attendance and testimony of witnesses..." 42 Pa. C.S. §6333(a).

FILED/ORIGINAL

2019 MAR -6 PH 1: 47

10

In answering the question of whether children shall testify at involuntary termination proceedings, the Superior Court has held that "there is no statutory requirement nor is there any Pennsylvania appellate decision which permits *or requires* the testimony or preference by the child to be placed on the record as an integral part of a termination proceeding." In re B.L.L., 787 A.2d 1007, 1014 (Pa. Super. 2001) (emphasis added). Indeed, the Superior Court had already reached an identical result five years earlier, noting the lack of a "judicial decision, statute or constitutional provision which would entitle a natural parent to force an abused child to testify in an involuntary termination proceeding. We decline to create any such requirement." In re Child M., 681 A.2d 793, 798 (Pa. Super. 1996). Rather, at contested termination proceedings, the child has an attorney to represent his/her legal interests and a guardian ad litem to advocate for his/her best interests.[2] In re L.B.M., 161 A.3d 172, 175 (Pa. 2017); In re T.S., 192 A.3d 1080 (Pa. 2018); 23 Pa. C.S. §2313(a).[3] It is the job of these professionals, not the child, to convey the child's preferences to the court with respect to the potential terminations.

Turning to the case at bar, it is first clear that any reliance Mother and Father place on the CPSL are misplaced, for those statutes are largely distinct and absent

---

[2] "'Legal interests' denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. 'Best interests' denotes that a guardian ad litem is to express what the guardian ad litem believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." Pa. R.J.C.P. 1154 cmt.

[3] The "continuing viability" of the hardline rule set forth in B.L.L. prohibiting the use of a child's testimony at termination of parental rights hearings was recently called into question by Justice Wecht of the Pennsylvania Supreme Court, who argued that B.L.L. should be reevaluated "in light of L.B.M. and T.S." and in consideration of the value such testimony could have in clarifying any conflicts that may arise between the child's best and legal interests. Interest of J.C.F., 199 A.3d 859 (Pa. 2018) (Wecht, J., dissenting).

2019 MAR -6 PM 1:47

11

from the realm of dependency/termination proceedings. Next, although Pa. R.J.C.P. 1128 states a clear preference that a child be present at dependency proceedings, the rule also grants a court discretion to choose to conduct hearings in the child's absence if good cause is shown so long as the child's attorney is present. It is precisely this path that the Court took during the hearings underlying the instant appeal. Noting that K.M.R. did in fact appear at the August 8 and 9, 2017 hearings, this Court was otherwise satisfied that good cause existed to permit Children's absences at the remaining proceedings due to the fraught and tempestuous relationships between Children and Parents in addition to the need for Children to maintain attendance at school and extracurricular activities. However, Children's guardian ad litem and attorney were both present for and fully participated in all proceedings while advocating for Children's best and legal interests, respectively. Thus, at all times, the Court conducted the proceedings in compliance with the requirements of 42 Pa. C.S. §6351(e)(1) and 23 Pa. C.S. §2313(a). Lastly, Mother and Father failed to exercise their statutory right under the Juvenile Act to have subpoenas issued that would have compelled K.M.R. and J.L.A.'s presence at the hearings.

In short, Mother's and Father's arguments that either one or both of Children was withheld from the Court and barred from testifying, in violation of the CPSL and "without justification," are legally unsupported. For the foregoing reasons, these matters should not be considered on appeal.

## II. Lack of Competent Testimony and Other Evidentiary Issues

In their concise statements, Mother and Father each raise several issues with respect to the testimony elicited and evidence adduced at the proceedings. Both

53RD JUDICIAL DISTRICT

LAWRENCE COUNTY PENNSYLVANIA

Parents, at Nos. 6 and 7, contend that CYS supplied neither "any competent testimony" about the impact of termination on Children's best interests nor the bonds, or lack thereof, among Children, their foster family, and Parents. Mother alone raises additional concerns at Nos. 9 and 10 that there was insufficient evidence presented as to her incapacity to parent and that this Court misconstrued the testimony of her expert witness, Dr. Fred Gallo.

In termination of parental rights cases, the prevailing evidentiary standard is clear and convincing evidence. It is the burden of the party seeking termination to first proffer clear and convincing evidence that the parent's conduct satisfies one of the statutory grounds found at 23 Pa. C.S. §2511(a), and then to demonstrate that termination would benefit the needs and welfare of the child under a best interests standard pursuant to 23 Pa. C.S. §2511(b). In re D.L.B., 166 A.3d 322, 326 (Pa. Super. 2017) (internal citations omitted). The trial court acts as the factfinder in termination cases, meaning that it is "charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony...[in] carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence." In re Adoption of R.J.S., 901 A.2d 502, 506 (Pa. Super. 2006).

Over the course of the proceedings, CYS presented Mr. Brian Dick, Ms. Tanya Stahlman, and Ms. Amber Pieri. All testified as fact witnesses, while Mr. Dick was additionally certified as an expert in the areas of counseling and parental capacity assessments. As recounted in the January 16, 2019 Opinion, each of these professionals credibly testified to the troubling emotional relationship between Mother and Children. Ms. Stahlman and Mr. Dick also commented on Mother's lack of

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

empathy toward the traumatic experiences Children endured at her home and Mother's seeming inability to emotionally attune to Children despite months of counseling sessions. Ms. Pieri testified to documented instances of K.M.R.'s self-destructive behavior, such as pinching and attempted suffocation, following some extended interactions with Mother. All three witnesses further spoke to the lack of any positive feelings or genuine bonds worth saving between Parents and Children. Additionally, Ms. Pieri noted how Children have matured emotionally, physically, academically, and spiritually since moving in with their foster family in December 2013.

In response to CYS, Mother and Father each testified on their own behalf at the hearings. Mother additionally offered the testimony of Dr. Fred Gallo, a psychologist from Sharon, Pa., to speak to her parental capacity, whom this Court certified as an expert in psychology. However, unlike Mr. Dick, Ms. Stahlman, or Ms. Pieri, Dr. Gallo failed to observe Mother interact with Children during any of their sessions together, and consequently this Court accorded less weight to his conclusions on her parental abilities than those who observed Mother and Children together firsthand. During Mother's testimony, CYS also offered into evidence on cross-examination, which this Court admitted without objection, a "notice/demand" letter Mother wrote to CYS in June 2017 demanding the return of her "property," i.e. Children. This Court considered the letter and weighed it in conjunction with the voluminous testimony from Mr. Dick, Ms. Stahlman, and Ms. Pieri as to Mother's extreme and sustained difficulties in emotionally relating to Children. For his part, Father's own testimony underscored his struggles with substance abuse, domestic violence, and the criminal

14

justice system, all of which influenced this Court's conclusions as to his present and prospective inability to take Children into his care.

In sum, this Court remains resolutely convinced that CYS met its burden of presenting clear and convincing evidence showing the existence of the statutory grounds for termination under 23 Pa. C.S. §2511(a) through a combination of their fact and expert witnesses, admitted exhibits, and cross-examination of Mother and Father. Moreover, this Court remains satisfied that CYS presented sufficient evidence relevant to the considerations of 23 Pa. C.S. §2511(b), such as Ms. Pieri's observations of Children's lives with their foster family and multiple witnesses' retelling of Children's toxic bonds with Parents, in demonstrating that termination would serve Children's best interests. Next, we turn to Mother's contention with respect to Dr. Gallo's testimony. Although this Court gave fair consideration to the psychological testing Dr. Gallo performed on Mother, we simply could not accord much weight to his conclusions about her parenting abilities as they were unsupported by any personal observations, the lack of which stands in stark contrast to the three professionals who testified for CYS on this same point. Succinctly put, in reaching our decision, this Court allowed all parties to present their cases-in-chief and, upon exercising our discretion to examine and weigh the evidence supplied, concluded that CYS cleared its evidentiary hurdles. Therefore, these matters should not be considered on appeal.

### III. Issues with Reunification and the Family Service Plan

In their concise statements at Nos. 3 and 4, Mother and Father both contend that CYS failed to provide any type of reunification counseling or generate a service plan for reunification, and that CYS failed to provide any visitation between Parents

53RD
JUDICIAL
DISTRICT

.WRENCE COUNTY
PENNSYLVANIA

2018 MAR -5 PM 1: 47

15

and Children. Additionally, Father argues at Nos. 9 and 10 that CYS failed to refer him for a parental capacity assessment and that he could not have completed his family service plan due to a lack of services available in Lawrence County.

Whenever a dependent child is taken into foster care, the default goal is eventual reunification of the family. Congress mandated this policy in the federal Adoption and Safe Family Act of 1997 (ASFA). 42 U.S.C. §§671-679. Specifically, federal law requires that states shall make "reasonable efforts...to preserve and reunify families." 42 U.S.C. §671(a). In Pennsylvania, "the law prioritizes reunification initially" and to this end, child service agencies "must, of course, put forth a good faith effort in making [rehabilitative services necessary for the performance of parental duties and responsibilities] available to the parent." In Interest of C.K., 165 A.3d 935, 943-44 (Pa. Super. 2017) (quoting In re J.J., 515 A.2d 883, 890 (Pa. 1986)). Child service agencies typically fulfill this requirement through the implementation of family service plans, which must be prepared for "all families receiving services." Burns v. Department of Human Services, 190 A.3d 758, 763 n.8 (Pa. Cmwlth. 2018); 55 Pa. Code §3130.61; 55 Pa. Code §3130.67. The child services agency has a clear duty to "make reasonable efforts to finalize the permanency plan [that] is independent of the parents' duty to accept such efforts." C.K., *supra*, at 943.

However, while an agency is expected under the law to make reasonable efforts to promote reunification, this duty is not unlimited in time or scope. "If reunification is not viable 'after reasonable efforts have been made to reestablish the biological relationship,' child welfare agencies must work 'toward termination of parental rights, placing the child with adoptive parents,' ideally within 18 months." Id.

FILED OF RECORD

2019 MAR -6 PM 1: 47

16

at 944 (quoting B.L.L., *supra*, at 1016). The Superior Court has also stated that "we cannot require CYS to extend services beyond what our legislature had deemed a reasonable time after state intervention...[the] state's interest in preserving family unity must be weighed along with the state's interest in protecting children." In re J.T., 817 A.2d 505, 509 (Pa. Super. 2003) (citing In re Adoption of A.N.D., 520 A.2d 31 (Pa. Super. 1986)). Simply put, the agency "is not expected to do the impossible and is not a 'guarantor of the success of the efforts to help parents assume their parental duties.'" C.K., *supra*, at 942 (quoting In re A.L.D., 797 A.2d 326, 340 (Pa. Super. 2002)).

Part of those reasonable efforts toward reunification include the child services agency facilitating visitation between children and their parents, although the Juvenile Act itself does not specify the necessary frequency of those visits. In re C.J., 729 A.2d 89, 93 (Pa. Super. 1999) (citing In the Interest of M.B., 674 A.2d 702, 706 n.3 (Pa. Super. 1996)). Administrative regulations provide that the child services agency must provide visitation opportunities at least once every two weeks unless certain exceptions apply, such as visitation running contrary to the child's best interest or limitation by court order. 55 Pa. Code §3130.68(a)(3). Courts are generally cautioned against restricting visitation when the goal of the family service plan remains reunification unless a grave threat exists to the child's welfare. C.J., *supra*, at 95.

From the foregoing, the law may be summarized as follows. It is clear that once a child is adjudicated dependent and taken in CYS care, the agency is required to compile a family service plan that has at its outset a goal of eventual reunification of the child and parents, and then must make reasonable efforts at providing services to

53RD
JUDICIAL
DISTRICT

LWRENCE COUNTY
PENNSYLVANIA

2018 MAR -6 PM 1:47

17

the family to achieve those ends, including visitation. In turn, the parent has a corresponding duty to make reasonable efforts to take advantage of these services and cooperate with CYS to effectuate eventual reunification. This arrangement is reviewed every six months at the permanency review hearings, and if insufficient progress on the reunification front has been made, the child services agency may then move toward termination of the parent's rights.[4]

Despite the clear mandate favoring reunification imposed on CYS and other child services agencies, an important question arises concerning the appropriate sanction for agencies seeking termination of parental rights that nonetheless failed to provide reasonable efforts toward reunification. In <u>In re D.C.D.</u>, 105 A.3d 662, 671-72 (Pa. 2014), the Pennsylvania Supreme Court concluded that "neither [23 Pa. C.S. §2511(a) or (b)] requires a court to consider reasonable efforts provided to a parent prior to termination of parental rights. Nevertheless, this Court has observed that the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child." (citing <u>In re Adoption of S.E.G.</u>, 901 A.2d 1017, 1029 (Pa. 2006)). Rather than denying an otherwise meritorious termination petition to punish an agency for failing to expend reasonable efforts on reunification services, the high court directed that the appropriate remedy was for the trial court "to conclude on the record that the agency has failed to make reasonable efforts, which imposes a financial penalty on the agency of thousands if not tens of thousands of dollars under [ASFA]." Id. at 675.

---

[4] Permanency review hearings at six-month intervals are required by statute. 42 Pa. C.S. §6351(e)(3).

18

In short, the trial court must only determine whether the party seeking termination has satisfied the statutory grounds at 23 Pa. C.S. §2511; reunification services, or the lack thereof, may be relevant, but cannot be a basis for denying an otherwise worthy and proven termination petition.

The basic facts of this case indicate that CYS developed a family service plan (FSP) by April 2014, within six months of Children coming into care, and that the FSP's ultimate goal was reunification with Parents ("return to parent or guardian"). *See*, e.g., Permanency Review Orders dated 9/16/15, 3/11/16, 9/2/16, 3/22/17, 9/17/18. The FSP, which applied to both parents, was comprehensive and contained steps individually tailored to Mother's and Father's respective circumstances. Mother's FSP included requirements that she, *inter alia*, maintain a clean home, undergo mental health and psychological assessments, complete domestic violence counseling, complete a parental capacity assessment, and undergo a drug and alcohol evaluation. Father's FSP included similar steps and also required that he complete anger management and a batterer's support group.

It is plainly evident that CYS provided reasonable efforts toward Mother because she made substantial progress with completing all points of her plan.[5] Mother was able to achieve nearly all goals of her FSP, as she successfully obtained mental health and psychological evaluations, attended a domestic violence support group, cleaned up her home, and attended parenting classes. The only remaining factor on her FSP was completing a second parenting capacity assessment, and the

---

[5] For example, CYS referred Mother to Mr. Brian Dick, who performed a parental capacity assessment in December 2014. Although Mr. Dick did not give Mother a favorable rating in this first assessment, CYS decided to refer Mother for a second assessment with Mr. Dick in August 2016 to examine whether she had made any progress in the interim. Second referrals, as Mr. Dick testified, are extraordinarily rare.

53RD
JUDICIAL
DISTRICT

/RENCE COUNTY
ENNSYLVANIA

2018 MAR -6 PM 1:40

19

record demonstrates that Mother failed to follow up on this despite repeated prompting from CYS and Mr. Brian Dick in late 2016. CYS also facilitated reunification counseling between Mother and Children from 2014 to 2017 through providers Tressa French and Tanya Stahlman. During Ms. Stahlman's work with Mother and Children, she refocused the sessions from reunification to resolution in order to address some serious and outstanding issues between Mother and Children, particularly K.M.R. In any event, at no time in this case did CYS fail to provide services for Mother or opportunities for her to complete the FSP.

Children maintained regular, biweekly social visitation with Mother in the time between January 2014 and November 2014, at which point CYS stopped scheduling visits at Children's behest. Ms. Pieri, Children's CYS caseworker, noted that their refusal to attend stemmed from Mother's alleged misbehavior during some visits, such as pinching K.M.R. and asking her to lie to CYS, which caused so much stress for K.M.R. that she resorted to self-destructive and self-harming behavior. Recognizing these dangers to Children's well-being, the Court issued an order on January 6, 2015 limiting visitation with Mother pending the discretion of a counselor who would determine if and when visitation would resume, which was continually readopted by subsequent permanency review orders. See, e.g., Permanency Review Orders, 9/15/15 and 9/17/18.

Father was also subject to the FSP, although his ability to comply was somewhat hamstrung by his enrollment in the Teen Challenges Program and repeated incarcerations. Indeed, when he was out of jail, Father was able to enjoy both social

2019 MAR -5 PM 1: 48

20

visitation with Children and later counseling sessions with K.M.R.[6] It is also apparent that when he was not imprisoned, Father was in close contact with CYS, specifically Children's caseworker Ms. Amber Pieri. By these indications, CYS seemed generally willing to work with Father on his FSP compliance, and moreover there is nothing in the record to suggest that CYS deliberately withheld Father from a parental capacity examination. Rather, given Father's intermittent availability and documented lack of a permanent residence, it is likely that the time was not yet ripe for a parental capacity assessment, a process which requires that the evaluator visit the home and observe how the parent and child interact in their natural setting. Further, setting aside concerns that Father failed to raise any issues at the hearings with respect to the availability of a batterer's support group in Lawrence County, the FSP did not mandate that he attend the support group with any specific provider.[7] Indeed, even accepting Father's premise as true (i.e. the dubious claim that no batterer's support groups of any kind are available in Lawrence County), a thorough search by this Court uncovered no legal requirement that CYS had to ensure Father's ability to complete the FSP entirely within his county of residence.

In sum, Mother's and Father's contentions that CYS failed to provide a family service plan and failed to provide reasonable efforts toward reunification are clearly

---

[6] Father's visitation rights were also specifically addressed by a September 2015 Order of Court following his release from the Teen Challenges Program. The record indicates that Father enjoyed social visitation with Children approximately once every two weeks between September 2015 and February 2016.

[7] Pa. R.A.P. 302(a) states that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." See also Jones v. Ott, 191 A.3d 782 (Pa. 2018). During the numerous termination hearings, Father never placed on the record any issue with respect to CYS' purported failure to ensure that he could attend a batterer's support group in Lawrence County. Nonetheless, this Court addresses this contention with the caveat that we only do so in the interest of a full and fair exploration of the issues before the Superior Court.

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

2018 MAR -6 PM 1:49

21

indefensible when considered next to the facts of this case. CYS developed FSPs for both Parents and then expended considerable resources to help Parents realize the overarching goal of reunification with Children. To the extent that Mother and Father assert that their right to visitation with Children was improperly curtailed, it is noteworthy that the question of visitation frequency was addressed through two orders of court that instituted specific limitations in response to seriously concerning misbehavior from each parent. Likewise, Father's additional arguments are betrayed by his inability to maintain a residence suitable for a parental capacity evaluation and the absence of any legal standard requiring the provision of all reunification services in the parent's home county.

Moreover, even if it is determined that CYS failed to provide reasonable efforts toward achieving reunification, Mother's and Father's arguments necessarily fail. As set forth by the D.C.D. Court, the appropriate sanction is a notation on the case record which would then cost CYS thousands of dollars in federal funding. Besides the fact that this Court made no such finding on the record, CYS met its statutory burden for proving termination under 23 Pa. C.S. §2511.[8] Therefore, regardless of the reasonableness of CYS' reunification efforts, termination was proper in this case and these errors should not be considered on appeal.

## IV. Failure to Apply the Law to the Facts of the Case

Mother and Father each contend at No. 2 of their concise statements that this Court failed to apply the law to the facts of the case and return Children to Parents,

53RD
JUDICIAL
DISTRICT

LWRENCE COUNTY
PENNSYLVANIA

---

[8] See IV. Failure to Apply the Law to the Facts of the Case, infra.

22

with Mother individually complaining that she was entitled to regain custody of Children because she had completed her FSP.

The law that trial courts must apply to termination petitions is well settled and ironclad. Courts must always be mindful that parents have a constitutionally guaranteed right to the control, care and custody of their children, which is abrogated and converted into the child's right to proper care only upon the breach of their parental duties. In re A.S., 11 A.3d 473, 478 (Pa. Super. 2010). In Pennsylvania, courts safeguard these rights and balance the competing interests by adhering to the bifurcated analysis mirroring the structure of 23 Pa. C.S. §2511:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of the best interests of the child.

In re D.L.B., 166 A.3d 322, 326 (Pa. Super. 2017) (citing In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and convincing evidence is defined by the Superior Court as "evidence as that which is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (citing In re C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc)).

For purposes of this appeal, CYS filed the termination petitions asserting that grounds for termination existed as to both Mother and Father at 23 Pa. C.S.

2018 MAR -6 PM 1:48

23

§2511(a)(2) and (a)(8), and that Children's needs and welfare would be best served by termination pursuant to Section 2511(b).[9] In the January 16, 2019 Opinion, this Court recounted at length the precedents which guided our evaluations of grounds for termination at 23 Pa. C.S. §2511(a)(2).[10] Pertinent to any consideration of termination under Section 2511(a)(2) is that "parental incapacity that cannot be remedied [is] not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as *incapacity to perform parental duties*." Matter of Adoption of M.A.B., 166 A.3d 434, 444 (Pa. Super. 2017) (internal citations omitted) (emphasis added).

---

[9] 23 Pa. C.S. §2511. Grounds for involuntary termination

(a) General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement or the child continue to exist and termination of parental rights would serve the best needs and welfare of the child.

\*\*\*

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

[10] See, e.g., In re N.A.M., 33 A.3d 95, 100 (Pa. Super. 2011); In re Interest of Lilley, 719 A.2d 327, 330 (Pa. Super. 1998); In re Geiger, 331 A.2d 172 (Pa. 1975); In re E.A.P., 944 A.2d 79, 82 (Pa. Super. 2008).

For Section 2511(a)(8), this Court extensively applied the tripartite test set forth by In re M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003).[11] Lastly, for the Section 2511(b) branch of the analysis, this Court relied on M.A.B., *supra*, at 448 and T.S.M., *supra*, at 269 which require that trial courts consider the bonds that exist between a parent and child, as well as myriad other factors, such as love, comfort, safety, and relationships with the foster family. *See also* In re Adoption of C.D.R., 111 A.3d 1212 (Pa. Super. 2015); A.S., *supra*, at 483. In short, the law that Pennsylvania courts must unwaveringly apply when evaluating termination petitions is 23 Pa. C.S. §2511, the subsections of which in turn necessitate the bifurcated analysis as further interpreted and expanded through case law.

In the case *sub judice*, CYS had the burden of proving by clear and convincing evidence that grounds for terminating Mother's and Father's parental rights existed under 23 Pa. C.S. §2511(a)(2) and (a)(8). Regarding Mother (and disregarding her assertion that she completed every item on the FSP; *see* III., *supra*), this Court was satisfied that CYS provided clear and convincing evidence that Mother exhibited an irremediable emotional incapacity under Section 2511(a)(2), i.e. that Mother could not provide essential care and control of Children due to her inability to have any semblance of an emotional relationship with them. However, this Court was not persuaded that grounds for termination existed as to Mother under Section 2511(a)(8), and thus denied that ground. Likewise, applying the test set forth by Section 2511(b),

---

[11] In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003) stated as follows with respect to Section 2511(a)(8): "[The] following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child."

this Court was satisfied that Children's best interests would be served by termination. Regarding Father, this Court concluded that CYS met its burden for showing that grounds for terminating his parental rights existed under Section 2511(a)(2) and (a)(8), and that it would again be in Children's best interests under Section 2511(b) to have his rights terminated. At all times, this Court applied the statutory and case law provisions applicable to the asserted grounds for termination, and made its decisions based on the strength of the evidence presented. Therefore, this matter should not be considered on appeal.

### V. Failure to Stay Final Order Pending Dependency Appeals

At No. 8 on their concise statements, Mother and Father each argue that this Court erred by failing to stay issuing its final order on the involuntary terminations while the Dependency Appeals remained pending before the Superior Court.

Pennsylvania Rule of Appellate Procedure 1701 governs the effect an appeal has on the trial court below. Pa. R.A.P. 1701(a) states that unless otherwise prescribed by the rules, "after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter." However, Pa. R.A.P. 1701(c) (emphasis added) qualifies this by decreeing that "[w]here only a particular item, claim or assessment adjudged in the matter is involved in an appeal...the appeal or petition for review proceeding shall operate to prevent the trial court or other government unit from proceeding further *with only such item, claim or assessment...*"

Additionally, clear precedent from the Pennsylvania Superior Court disfavors staying all proceedings involving a dependent child solely because one issue or order

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

is on appeal. "Depriving a Juvenile Court of jurisdiction merely because a single Order, involving any issue or party, has been appealed…would also frustrate the statutory authority of the Juvenile Court to exercise continuing independent and original authority to adjudicate in the best interests of a dependent child." In re Griffin, 690 A.2d 1192, 1200 (Pa. Super. 1997). Indeed, "[maintaining] the status quo while awaiting resolution of a parent's appeal could never justify the risk to a child forced to remain in a possibly safe or unsatisfactory situation." In re R.P., 956 A.2d 449, 455 (Pa. Super. 2008).

Here, the Dependency Appeals of October 5, 2018, involved separate issues from the termination petitions and motions for goal change. While it is undeniable that, for purposes of judicial economy, this Court scheduled and conducted hearings for both tracks of cases concurrently, ultimately the two sets of cases are concerned with different legal issues and outcomes. Therefore, this Court, pursuant to Pa. R.A.P. 1701(c) and the aforementioned case law, declined to stay the termination proceedings; accordingly, this matter should not be considered on appeal.

For the foregoing reasons, we respectfully request that the Superior Court affirm our January 16, 2019 Order of Court, and dismiss the appeal in this matter.

53RD
JUDICIAL
DISTRICT

.WRENCE COUNTY
PENNSYLVANIA

27

IN THE INTEREST OF:

K.M.R.

J.L.A.

: IN THE COURT OF COMMON PLEAS

: LAWRENCE COUNTY, PENNSYLVANIA

: NO. 94 OF 2013, DP;
  NO. 20012 of 2017, OC-A

: NO. 95 OF 2013, DP;
  NO. 20011 of 2017, OC-A

## APPEARANCES

For Children and Youth Services:

Carolyn Flannery, Esq.
1001 East Washington Street
New Castle, PA 16101

For Natural Mother, M.R.:

Dennis McCurdy, Esq.
539 Main Street
Harmony, PA 16037

For Natural Father, C.A.:

Bradley G. Olson, Jr., Esq.
28 North Mill Street
New Castle, PA 16101

For the Minors:

Paula Cialella, Esq.
113 N. Mercer Street
New Castle, PA 16101

Guardian Ad Litem:

Nora DiBuono, Esq.
701 First Avenue
Ellwood City, PA 16117

## OPINION

Hodge, J.

January 16, 2019

Presently before this Court are the Petitions for Involuntary Termination of

Parental Rights (Termination Petitions) filed by Lawrence County Children and Youth

Services (CYS) against both natural parents, M.R. (Mother) and C.A. (Father)

(collectively Parents), as to two of their minor children, K.M.R. and J.L.A. (collectively

Children), and Motions for Goal Change from reunification to adoption. For the reasons set forth below, this Court grants the Petitions for Involuntary Termination of Parental Rights and the Motions for Goal Change.[1]

## Procedural History

The lengthy and complicated procedural history and record of this case is virtually inseparable from that of the companion dependency cases, and thus a brief summation of those earlier proceedings is as follows. Children were first taken into emergency care by an order of this Court dated November 4, 2013. CYS then filed a dependency petition on November 18, 2013, and three days later, this Court adjudicated both Children dependent, pursuant to the Juvenile Act (42 Pa. C.S. §§6301 et seq.), based on evidence presented that Father had physically assaulted Mother with Children present — and that Mother's home had deplorable conditions. Accordingly, by dispositional order dated January 5, 2014, this Court assigned legal and physical custody of Children to CYS. Since the initial dependency finding this Court has conducted permanency review hearings approximately every six months as required by the Juvenile Act and has continued to find Children dependent, and their placement in foster care appropriate, as documented by each permanency review order to date and including the most recent one issued on September 17, 2018.[2]

---

[1] Although the bulk of this opinion and order addresses the Termination Petitions, filed under the Orphans' Court docket numbers (Nos. 20011 and 20012 of 2017, OC-A), for purposes of judicial economy we include the Motions for Goal Change which were filed under the companion dependency docket numbers (Nos. 94 and 95 of 2013, DP).

[2] On October 5, 2018, Mother appealed this permanency review order to the Superior Court. Later, on November 1, 2018, Mother moved that adjudication on the Termination Petitions be stayed pending the Superior Court's decision on the dependency appeal, but this Court denied the motion. See Order of Court, December 4, 2018.

Following several years of dependency hearings, CYS presented the Motions for Goal Change and Termination Petitions on April 11, 2017, alleging that Mother's and Father's parental rights should be terminated pursuant to 23 Pa. C.S. §2511(a)(2) and (8). This Court conducted the following hearings, and the following witnesses testified, over a sixteen-month period and formed the bulk of the factual record underlying this opinion:

1. August 8 and 9, 2017; K.M.R. and therapist Tanya Stahlman;

2. September 26, 2017; Ms. Stahlman (continued) and counselor Brian Dick;

3. March 28 and 29, 2018; psychologist Dr. Fred Gallo and CYS caseworker Amber Pieri;

4. June 26, 2018; Ms. Pieri (continued) and testimony from Father and Mother;

5. August 27, 2018; CYS caseworker Kristen Pauline.

Besides the considerable evidence accumulated at these hearings, all parties stipulated at the first hearing (August 8, 2017) to incorporate the factual record of the dependency cases into the record of the Termination Petitions and Goal Change Motions. Following the close of evidence on August 27, 2018, this Court permitted all parties to file proposed findings of fact and conclusions of law, which were received by October 31, 2018.

## FINDINGS OF FACT

### I. Parties to the Case

1. K.M.R. is a female child born November 6, 2001, in Lawrence County, Pennsylvania.

2.  J.L.A. is a female child born January 18, 2006, in Lawrence County, Pennsylvania.

3.  M.R. is 39-years-old, single and the natural mother of both K.M.R. and J.L.A.

4.  C.A. is 36-years-old, single and the natural father of both K.M.R. and J.L.A.

5.  Mother and Father have never been married to one another nor have they ever maintained a joint household.

## II. Events Leading up to and Immediately After Placement

6.  Prior to November 2013, Children lived with Mother in a trailer on the maternal grandfather's property on Patterson Road, New Castle, PA. At that time, the trailer suffered from general disarray, with trash, debris and drug paraphernalia scattered about, and lacked a working toilet. Notes of Testimony (N.T.), 6/26/18 at 140.

7.  Father did not officially reside at Mother's home but spent considerable lengths of time there, often coming and going for days or weeks at a time. Additionally, Father and Mother were in an intermittent romantic relationship in the months and years leading up to November 2013. Id. at 83, 141, 189.

8.  Children witnessed abusive and dysfunctional behavior at the household prior to November 2013, including recurrent acts of domestic violence perpetrated by Father against both Mother and K.M.R., heavy use of alcohol and drugs by Father, and a general neglect by both Parents to perform basic household responsibilities such as cooking and cleaning. N.T., 3/16/17, at 13-14, 52.

9.  At the family home, K.M.R. recalled that Mother seemed to "put blinders on" with regard to Father's destructive behavior, i.e. tended to ignore, downplay or

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

4

minimize it, even to the detriment of Children. On the few occasions Mother took action in response to Father's behavior, such as staying in an alternate location for the night, K.M.R. stated that Mother tended to reunite with him soon after. Id. at 9, 13.

10. Neither Mother nor Father had a full-time job as of November 2013. A stay-at-home mom, Mother's primary source of income consisted of monthly disability checks she had been receiving since 2001. Meanwhile, Father was "a completely different person," addicted to heroin, alcohol and pain pills, and mainly focused on where to get and how to pay for his next dose of drugs. N.T., 6/26/18, at 19, 54 194, 195.

11. Mother declined to enroll K.M.R. in the local public school system, the Laurel School District, and chose instead to homeschool her. Mother intended the same for J.L.A. but could not do so because at the time, J.L.A. had not yet reached the age of eight-years-old, the minimum required for schooling in Pennsylvania. Id. at 154, 202.

12. On November 2, 2013, under the influence of drugs, Father beat, punched and assaulted Mother violently and constantly for a period of six hours and inflicted injuries so severe, including a punctured lung, that she had to be flown via helicopter to Pittsburgh for medical treatment. Mother later estimated that Father struck her approximately 300 times during this episode and that she required nearly a week of hospitalization before becoming stable enough for release. Children were present for and witnessed at least some portion of this attack, part

of which was captured by K.M.R. on video, before fleeing to their maternal grandfather's house and calling for help.  N.T., 6/26/18, at 95, 176-77, 187.

13. The Pennsylvania State Police responded to this emergency call and arrested Father, who was subsequently charged with, *inter alia*, aggravated assault. Father later pleaded guilty to the aggravated assault charge and on March 19, 2014, the Honorable Judge J. Craig Cox sentenced him to incarceration with immediate parole to the custody of the Teen Challenges Program.  Id. at 105.

14. During their response to Mother's home, the Pennsylvania State Police observed the household to be in "deplorable" condition.  At least some of this disarray was a direct result of Father's assault on November 2, 2013.  Dependency Petition, November 15, 2013, at 3.

15. Because Mother had been flown to Pittsburgh for medical care and Father had been taken to the Lawrence County Correctional Facility, neither parent was able to provide care for Children on November 2, 2013.  Based on the lack of parental supervision and the unsanitary conditions of Mother's residence, the Pennsylvania State Police referred Children to CYS for immediate placement.  In turn, CYS obtained an order from the undersigned judge for emergency custody on November 4, 2013.  *See* Order of Court, November 4, 2013.

16. CYS next filed a dependency petition on November 15, 2013, which this Court considered at a hearing on November 21, 2013.  Upon consideration of the petition and the evidence presented, this Court adjudicated Children dependent on November 21, 2013, and took further action with regard to their placement through a Dispositional Order dated December 4, 2013, which granted CYS

physical and legal custody. Children have remained with the same foster family since December 14, 2013. *See Permanency Review Order, September 17, 2018.*

17. As required by the Juvenile Act, permanency review hearings have taken place approximately every six months to evaluate whether the finding of dependency and Children's placement remains appropriate. The most recent review hearing took place on September 17, 2018.

18. By the spring of 2014, within months of Children's initial placement, CYS caseworker Kristen Pauline developed the initial Family Service Plan (FSP) (also known as a Child Protective Plan, or CPP) that outlined the steps Parents were required to take prior to any reunification with Children. The FSP was drafted in response to the conditions that necessitated Children's removal from the home. Some steps of the FSP applied to both parents, while others pertained to only one of them. Among the steps on Parents' FSP:

- Keep the home clean and free from clutter.

- Schedule a mental health assessment to determine if the parent has any mental health issues that would impact parenting the child.

- Obtain a psychological assessment.

- Complete domestic violence counseling.

- Complete anger management classes

- Complete a parental capacity assessment.

- Undergo a drug and alcohol evaluation.

N.T., 3/28/18, at 144-45, 8/28/18 at 31.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

7

19. In addition to the affirmative steps required of Parents, reunification was contingent upon the successful completion of counseling sessions between each Parent and Children designed to discuss and work through outstanding issues. At various times, Children participated in counseling sessions with either Parent, but at no time were both Parents and both Children present at the same therapy session. Between early 2014 and September 2015, therapy was facilitated by Tressa French, and then by Tanya Stahlman from September 2015 to June 2017. N.T., 8/8/17, at 9, 10.

20. Alongside the efforts to complete the FSP and counseling, Mother and Children engaged in CYS-supervised social visitation from January 2014 to September 2014, as required by regulation.[3] Largely at Children's insistence, CYS stopped scheduling and facilitating visits in September 2014, which prompted Mother to file a Motion to Resume Visitation in November 2014. On January 6, 2015, the Court issued an order appointing a special counselor who had discretion to determine if, when, and how visitation would resume. These issues remained unresolved with each subsequent permanency review order, as all specifically provided that "Prohibition of contact with [Children] shall continue unless approved by [CYS] and by further order." Order of Court, January 6, 2015; N.T., 3/28/18, at 153.

21. Though unbeknownst to her parents at the time, K.M.R. was the victim of sexual abuse committed by a neighbor, the now-deceased David Anderson, for a period of approximately one year predating her placement with CYS, from sometime in

---

[3] 55 Pa. Code §3130.68.

2012 to November 2013. The Pennsylvania State Police opened a criminal investigation into Mr. Anderson but he died before charges could be filed. K.M.R. eventually revealed the abuse to Mother during later therapy sessions with Tressa French. N.T., 3/16/17 at 63; Petitioner's Exhibit 2, 3/16/17; N.T., 8/8/17, at 112.

### III. Findings as to Mother

#### A. Psychological Evaluations

22. After the FSP was finalized in April 2014, Mother complied with many of its requirements. Amber Pieri, the CYS caseworker who succeeded Kristine Pauline, reported that Mother had provided a drug and alcohol evaluation, completed parental education classes and domestic violence counseling at the Crisis Shelter, obtained psychotherapy, and underwent a psychological evaluation. Id. at 178-84.

23. Mother first obtained a psychological evaluation from Dr. Martin Meyer on January 17, 2014, at Vocational and Psychological Services. Unsatisfied with that report, due to the inclusion of what she considered inaccurate statements that had been relayed by Cerissa Fortune of the Crisis Shelter, Mother sought out a second psychological evaluation from Dr. Fred P. Gallo in Sharon, Pa. in January 2016. Id. at 11, N.T., 6/26/18, at 178-79.

24. Dr. Gallo, who received his Ph.D. from the University of Pittsburgh in 1984, is a licensed psychologist in the Commonwealth of Pennsylvania and board certified in comprehensive energy psychology. Dr. Gallo was certified as an expert witness in the field of psychology at the March 28, 2018 termination hearing. N.T., 3/28/18, at 7.

9

25. Dr. Gallo additionally testified as a fact witness with respect to the psychological evaluation he performed on Mother on January 18 and 20, 2016, whose goal was to evaluate Mother's "psychological functioning and her fitness for reunification for her children." Id. at 32.

26. As part of the evaluation, Dr. Gallo administered a wide range intelligence test, the Beck Anxiety Inventory, the Beck Hopelessness Scale, the Minnesota Multiphasic Personality Inventory, some projective tests, the Thematic Apperception Test, and a parent/child relationship inventory, all of which are approved diagnostic tools from the American Psychological Association. Dr. Gallo obtained additional material for his evaluations from conversations with other professionals familiar with Mother, such as counselor Jim Hines and therapist Tressa French. Id. at 25-30.

27. Dr. Gallo drew the conclusions that Mother presented with a superior intellectual ability, did not present with severe depression or anxiety, did not demonstrate signs of post-traumatic stress disorder, or any major psychological disorders. Dr. Gallo further stated that Mother's "psychological functioning is adequate and that she has good parenting skills...she appears to be highly motivated to resume the strong connection with children regardless of the time that it is taking." Id. at 32-33 (quoting from Mother's Exhibit D).

28. Dr. Gallo opined that Mother's psychological condition permitted her to resume supervised visits with Children and proceed with reunification counseling. Id.

29. Although he reached conclusions on Mother's parenting abilities, Dr. Gallo's assessments were neither a custody evaluation nor a parental capacity

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

10

assessment. Moreover, Dr. Gallo never observed Mother together with Children during his psychological study or met with Children to discuss their impressions of Mother. Accordingly, no input from Children was used when compiling the final report and its conclusions. Id. at 23.

30. Dr. Gallo testified about a number of psychological conditions that could compel a parent to verbalize appropriate parenting techniques during an evaluation ("telling you what they think you want to hear") but then be unable to practice those techniques with his/her children, such as sociopathic disorder, antisocial disorder, multiple personality disorder, or associative identity disorder. Id. at 64.

## B. Testimony of Mr. Brian Dick

31. Brian Dick, a licensed professional counselor at Family Pathways, received a referral from CYS in June 2014 to perform a parental capacity assessment on Mother. Because of his experience in performing hundreds of parental capacity and bonding evaluations since 2002, Mr. Dick was certified as an expert witness in the realm of counseling and performing parental capacity assessments at the September 26, 2017 termination hearing. N.T., 9/26/17, at 92-95, 125.

32. The goal of the parental capacity assessment was "to identify strengths and weaknesses, areas that would be pertinent for the parent to focus on moving forward in their [FSP]." The report was broken down into four categories of parental capacity: cognitive, physical, behavioral, and emotional. Id. at 98-99.

33. Mr. Dick completed the parental capacity assessment by December 2014 using a variety of sources, including one-on-one interviews with Mother, observing how

she and Children interacted together during supervised visits, and touring Mother's home. Id. at 106.

34. Mr. Dick gave Mother generally high marks for her cognitive capacity but noted that she had room for improvement with ability for insight. For physical capacity, Mr. Dick concluded that nothing physically impaired Mother's ability to care for Children, nor did he observe any "deplorable" conditions at Mother's home. Id. at 102-03

35. In behavioral capacity, defined as "[behaving] in a matter that's able to forward a child's best interests," Mr. Dick observed that Mother tended to minimize Children's knowledge or observations about things that happened around the house (e.g. Father's drug usage or abusive treatment of Mother), even though these were factors that directly led to their placement in foster care, and further that she exhibited high defensive responding. Because Mother continued to engage in or downplay these and other behaviors that led to the original placement, Mr. Dick gave her a negative behavioral capacity indicator. Id. at 101, 104-05.

36. With respect to emotional capacity, Mr. Dick described this as the capstone because "it all builds on the other pieces." Mr. Dick found that Mother exhibited serious deficiencies in this category and that she had "a lot that she needed to do to repair her relationship with the children." Despite observing Mother engage in behaviorally appropriate activities with Children during supervised visits, he noted "just a lack of emotional connection" related to her lack of empathy over what

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

12

happened with her and Children at her home and what she needed to do to move the relationship forward. Id. at 106-08, 172.

37. Based on these observations, Mr. Dick completed the parental capacity assessment in December 2014, and recommended that Children remain in CYS care due to Mother's "limits in her emotional, cognitive and behavioral capacity." Indeed, Mother's distant posture toward Children is what stood out the most to Mr. Dick when he compiled the assessment, as he recalled "it was just this very flat indifferent kind of emotionally disconnected presentation [that] really seemed to raise a red flag for me." Id. at 109-10, 177; CYS Exhibit 2.

38. In June 2016, Mr. Dick received a second referral from CYS to complete an updated parental capacity assessment along with a bonding assessment. Mr. Dick repeatedly attempted to contact Mother to arrange these evaluations but after multiple missed calls an messages, he failed to have any contact with her after August 22, 2016. Consequently, the referral lapsed in November 2016. To date, Mother has not completed a second parental capacity evaluation. N.T., 9/26/17, at 118-19.

## C. Testimony of Tanya Stahlman

39. Tanya Stahlman has been a licensed mental health therapist since 2008 and provided therapy to Children and Mother from September 2015 to June 2017 after taking over the case from previous therapist Tressa French. N.T., 8/8/17, at 7-8.

40. Ms. Stahlman's provided individual counseling sessions to Mother and each of Children approximately once a week, and also ran group sessions with all three of them approximately once every several weeks. Ms. Stahlman had a different

focus for each patient. For Mother, the focus was on "her ability to attune to her daughters' feelings, validate those feelings, understand their trauma experience, develop the necessary skills to parent a child [who] has dealt with trauma in their lives." For K.M.R., the sessions centered on how to "process and find resolution from the traumatic experiences that she has had in her life," both with respect to Parents and Mr. Anderson. N.T., 3/16/17, at 65, 76.

41. When Ms. Stahlman first took over the therapy sessions, the clinical goal remained family reunification. However, after K.M.R. expressed resistance to that goal, Ms. Stahlman reoriented the sessions from reunification to resolution, i.e. "what does it mean to understand the circumstances that have happened to her, how can [she] and her mother talk about the traumatic experiences that they have had in relation to one another and then overcome those feelings." Children opposed reunification counseling because they "felt that their psychological safety was at risk." Id. at 65-66; N.T., 9/26/17, at 23.

42. Once the goal was changed to resolution, K.M.R. made remarkable progress in identifying, sharing and verbalizing feelings, and developing healthy stress coping mechanisms, although she still occasionally engaged in self-harming behaviors (rubbing her skin raw, digging her fingernails into her arm, etc.). There has additionally been "progress in the reduction of negative feelings," like anger and frustration, between K.M.R. and Mother, but not much in the way of building positive feelings. N.T., 3/16/17, at 66-67, 74, 94.

43. With respect to J.L.A., Ms. Stahlman believed that due to her age, she was numbed and "overwhelmed with the amount of emotions that she feels" and had

"trouble identifying what she can communicate." Ms. Stahlman also observed that J.L.A. had a "stagnant and frozen" ability to connect with Mother following her experiences. Nonetheless, J.L.A. was able to indicate that she knew things were not "right and safe" at Mother's home and that severe trauma had likely taken place there. Id. at 69-72.

44. Although Ms. Stahlman noted that Mother was "very motivated and committed to trying to understand her daughters' experience and to acquire the necessary skills…to form an attachment with both of her daughters," she observed that Mother "still lacks the ability" to connect in way that is "sensitive and understanding and caring," as well as an ability to independently display empathy. Part of the disconnect, Ms. Stahlman explained, is attributable to Mother's own past traumatic experiences. Id. at 73-74, 79, 89.

45. Although Mother made "good efforts" and did better with taking accountability for traumatic events that happened to Children, Ms. Stahlman noted that Mother continued to struggle with emotional attunement that would "become a natural thing for her, one that doesn't need to be prompted or cued." Indeed, Ms. Stahlman observed that Mother did not have a natural inclination to be nurturing or caring towards her daughters, sometimes became "defensive or disconnected" when discussing feelings on traumatic events, and occasionally downplayed or minimized Children's traumas in comparison to that of other children. Id. at 89, 101, 104; N.T., 9/26/17, at 74.

46. Although K.M.R. and J.L.A. had separate goals and needs to address during therapy because of the different traumas each of them experienced, Ms.

Stahlman noted that the general relationship between the sisters was strong and that the dynamic between the two "has always been supportive [and] understanding." N.T., 3/16/17, at 96.

47. In early 2017, following 18 months of resolution therapy, Ms. Stahlman recommended that Mother follow through on the second parental capacity assessment previously suggested in June 2016 to identify where improvement had been made since the 2014 assessment with Mr. Dick. Id. at 68.

48. Once her sessions with Children and Mother had ended in June 2017, Ms. Stahlman explained that while Mother had certainly made progress ("she complied, she cooperated, she demonstrated ability"), she still lacked the rudimentary skills of "basic expression of emotion and understanding [emotions] in other people...communication with her daughters, understanding their needs and then being able to process that, hear that..." N.T., 9/26/17, at 31-32.

49. Ms. Stahlman stated that "forcing reunification with an individual that had a hand in their trauma, if the children are unwilling or unable to emotionally handle that" would effectively re-traumatize Children. Id. at 62.

50. Ultimately, "in spite of tremendous effort on [Mother's] part" throughout the therapy sessions, Ms. Stahlman concluded that "[Mother and Children] were never able to develop this connection where...the girls felt safe and secure in developing a relationship with her that would include love and acceptance and healthy communications..." Id. at 35, 73.

### D. Testimony of Amber Pieri

51. Ms. Amber Pieri has been the caseworker for Children since Ms. Pauline went on an educational leave of absence from CYS in August 2016, and was able to access all of the documentation and notations compiled on this case. N.T., 3/28/18, at 134.

52. Ms. Pieri reported that Children's feelings toward contact with Parents, and particularly Mother, evolved over the course of 2014. In January 2014, Children still reported a "positive outlook" oward reunification with Parents; by late September, these feelings changed to a refusal to participate in any social visitation, in part due to allegations that Mother exhibited inappropriate behavior during the visits such as pinching K.M.R. and asking her to lie to CYS. Some visits resulted in so much emotional distress to K.M.R. that she engaged in self-destructive behaviors such as biting/pinching herself and placing a plastic bag over her head while threatening to suffocate herself. Id. at 153-54; N.T., 3/29/18, at 21, 28.

53. Notwithstanding Children's newfound refusal to participate, CYS still made efforts to facilitate the social visits between Children and Mother for some length of time, likely at least until November 2014. N.T., 3/28/18, at 145-46.

54. Ms. Pieri recalled that following Children's September 2014 refusal to continue with social visitation, CYS had no immediate plans to refer the case for family reunification counseling. N.T., 3/29/18, at 29.

55. Setting aside issues pertaining to visitation and therapy, Mother generally complied and successfully completed most parts of the FSP: she provided a drug and alcohol evaluation, completed parental education classes and domestic

·violence counseling at the Crisis Shelter, obtained psychotherapy, underwent a psychological evaluation, and had a parental capacity assessment. N.T., 3/28/18, at 178-84; Mother's Exhibits F-L

56. Mother, unsatisfied with the results of both the psychological evaluation and the parental capacity assessment, and on her own initiative, obtained the aforementioned second psychological evaluation from Dr. Gallo and further attempted to get a new parental capacity assessment from Ms. Susan McConnell, even though she was not recognized as a service provider by CYS. Neither the psychological evaluation from Dr. Gallo nor the attempted second parental capacity assessment from Ms. McConnell was accepted by CYS for purposes of the FSP. N.T., 3/28/18, at 177-78.

57. The only remaining portion of the FSP for Mother to complete is the second parental capacity assessment. Moreover, the physical conditions at Mother's home that factored into the initial placement were no longer present by December 2017. By this time, the home had working utilities and appropriate furnishings for Children. Id. at 143, 152.

### E. Additional Findings

58. Mother testified at the June 26, 2018 termination hearing.

59. Mother testified that she received letters and cards from Children following their placement with CYS. N.T., 6/26/18, at 137.

60. Mother attended the trauma counseling sessions with Ms. Stahlman between 2015 and 2017 but made it known that her primary focus was on reunification with Children. Id. at 125.

61. Mother also submitted numerous requests to CYS to have social visitation restored following its suspension in September 2014, but did not see Children in a social capacity since then.[4] Id. at 126.

62. For a period of at least five years preceding the November 2013 incident that prompted placement, CYS responded to Mother's home on at least two occasions to follow up on reports filed by the paternal grandfather that the home was in disarray. Id. at 140.

63. Mother believed that the paternal grandparents had influenced Children and worked to turn them against her and sabotage any attempts at reunification. Id. at 130.

64. In June 2017 Mother composed and sent a "Notice/Demand" letter to CYS, apparently out of frustration that Children had not yet been returned to her, demanding the immediate return of her "property," i.e. Children. In her letter, Mother did not refer to either of Children by name because "I don't want their names, I want my children." Mother had researched old English law and the Declaration of Independence when drafting this letter and signed it at the bottom with a fingerprint. Id. at 145-47, 208; CYS Exhibit 5.

65. Mother did not believe any statements from CYS, therapists or other professionals that Children did not want to return to her care, even though K.M.R. herself made the same statement on the record during the March 16, 2017 permanency review hearing. See Paragraph 90, infra; N.T., 6/26/18, at 148, 150.

---

[4] Besides the therapy sessions with Ms. Stahlman, Children saw Mother briefly in late 2017 at a hospital visit following the birth of Mother and Father's third child together, A.A., a minor not involved in the cases sub judice but instead the subject of an unrelated dependency case, No. 58 of 2017, DP.

66. Although she denied that her relationship with Father prior to November 2013 was part of a cycle of domestic violence, Mother admitted that Father made threats against her in February 2013 that prompted her to seek a temporary Protection From Abuse (PFA) Order against him. Moreover, Mother conceded that any children who witness a cycle of domestic violence would likely be traumatized and agreed with the conclusion that Children had been traumatized. Id. at 186-88.

## IV. Findings as to Father

67. As of June 2018, Father was working for City Rescue Mission in their maintenance department and earning approximately $10 per hour. N.T., 6/26/18, at 16, 40.

68. Father was also required to complete the FSP after Children were placed in foster care. N.T., 8/28/18, at 31.

69. Following his sentencing in March 2014, Father remained in the custody of the Teen Challenges Program until his release in July 2015. At this program, Father took classes on anger management, drug and substance abuse, and life skills (e.g. finding a job). N.T., 6/26/18, at 22-23.

70. After his release from Teen Challenges, Father remained on probation, subject to regular check-ins with his probation officer and drug testing. Since July 2015, Father has been incarcerated in the Lawrence County Correctional Facility on three separate occasions for new charges, such as driving under the influence and retail theft: March 16, 2016-June 10, 2016; June 28, 2016-July 12, 2016; September 26, 2016-January 27, 2017. Id. at 25-26; N.T., 3/28/18 at 138-39; Guardian Ad Litem Exhibit 1.

71. Within the year leading up to the November 2013 assault, Father admitted that he had developed a severe drug problem, and over the days leading up to that incident had ingested heroin, cocaine and benzos. N.T., 6/26/18, at 25, 38-39.

72. Father also recalled that smaller incidents of domestic violence preceded his November 2013 assault on Mother, such as pushing and shoving. Id.

73. Father testified that, although not living full-time with Mother and Children at her residence, he had a general knowledge of the living conditions there and the fact that Children were not enrolled in the local public schools. However, Father was unaware of the sexual abuse inflicted upon K.M.R. at that time. Id. at 41, 53.

74. Although conceding that "I wasn't there as much as I should have been," Father generally described his pre-placement relationship with Children as "good" because "when we were together, we were happy." Id. at 45.

75. Father acknowledged that his behavior was part of the reason for the trauma Children suffered, particularly K.M.R. Id. at 96.

76. Father and Children engaged in social visitation approximately every other week between September 2015 and February 2016, pursuant to a September 2015 court order that placed oversight and discretion for visitation or any contact with Children in the hands of the court and CYS. Father stated that he generally enjoyed these visits. Id. at 50, 93, 100.

77. Social visitation with Children ceased after February 2016, following Father's incarceration, and any contact with him from January 2017 onward was solely within the confines of supervised sessions with Ms. Stahlman. Id. at 103.

78. Between March and June 2017, Father and K.M.R. engaged in a series of approximately five therapeutic visits (i.e. K.M.R. and Father would interact with one another as Ms. Stahlman stayed in the background to supervise). Father and K.M.R. discussed topics such as common interests, his substance abuse, the rationale behind some of his life choices, and the sexual abuse K.M.R. experienced at Mother's home. J.L.A. was unwilling to commit to such interactions with Father. N.T., 8/8/17, at 18-20.

79. K.M.R. felt a sense of resolution at the conclusion of these visits; afterward, however, she did not want to pursue any further reunification efforts with Father as she felt neither any attachment nor any sense of psychological safety with him. Id. at 21.

80. Ms. Pieri testified that she had discussed appropriate living arrangements for Children with Father should they be released to his care, but he did not have a suitable residence where Children could properly live with him. This was in part due to Father's incarcerations and his difficulty in finding a long-term residence for himself. N.T. 3/28/18, at 161, 168, 195.

81. Ms. Pieri additionally testified that as of the time the Termination Petitions were filed, Father had not yet complied with several components of the FSP, including obtaining a psychological evaluation, attending a batterer's group and completing a parenting course. Id. at 196-98.

## V. Findings as to Children

82. Ms. Pieri testified that when Children came into CYS care in November 2013, neither of them was able to recall her middle name nor provide a date of birth.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

Additionally, at the time of placement, neither a primary care physician nor a dentist had examined Children in years. Id. at 142.

83. After a brief stay with a short-term foster family, Children have lived with the same foster family since December 14, 2013. Id. at 141.

84. Children's foster family enrolled them in the local public schools, the Mohawk School District, and school administrators determined that both Children were performing below grade level expectations because of the instruction they received via Mother's homeschooling. J.L.A. was so behind that she had to repeat the second grade. Id. at 142; N.T., 8/27/18, at 22.

85. Children's academic performance has greatly improved since enrollment in the Mohawk School District; both have earned good grades on their report cards (e.g. A's and B's). K.M.R. still has occasional struggles with reading but in general has caught up to or surpassed the performance of her grade level peers. N.T., 3/28/18, at 171.

86. Besides her greatly improved academic performance, K.M.R. has become involved in extracurricular activities, like the school musical and marching band, and made friends among her classmates. N.T., 3/16/17, at 22.

87. Ms. Pieri has visited Children at their long-term foster home and characterized their stay there as "comfortable and happy," and noted that Children have formed not only a strong bond with their foster parents and siblings but even refer to their foster parents' natural children as "brother and sister." N.T., 3/28/18, at 172.

88. Ms. Pieri testified that it would be in Children's best interests if the termination of parental rights is granted because "there is no bond or attachment with the girls and either parent and they do not feel safe to go home." Id. at 170.

89. Ms. Stahlman testified that after her work with Children, she observed that "they did not feel that there was an attachment to their biological mother...and they were fearful that returning back to [her] home [and] the behaviors and environment that was present previous to their placement in foster care would represent itself." N.T., 9/26/17, at 23.

90. Testifying to her circumstances at a permanency review hearing, K.M.R. has stated that she has no desire to return to Mother's home or care, does not love her, and does not want any relationship with her going forward. K.M.R. has articulated similar apprehensions about living with Father. N.T., 3/16/17, at 40, 47-48, 53-54.

## CONCLUSIONS OF LAW

### I. Conclusions as to Mother

1. Prior to, during, and after the events relating to the placement of Children, Mother exhibited an irremediable emotional incapacity toward her Children that has caused, and would continue to cause, Children to be without essential parental care necessary for their mental well-being, which is grounds for termination under 23 Pa. C.S. §2511(a)(2).

2. Although Children had been removed from Mother's care for a period of more than 12 months predating the filing of the Termination Petitions, the conditions

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

which led to the removal and placement of Children have ceased to exist, and thus there are no grounds for termination under 23 Pa. C.S. §2511(a)(8).

3. The termination of Mother's parental rights will serve the developmental, physical, and emotional needs of the child as contemplated by 23 Pa. C.S. §2511(b).

## II. Conclusions as to Father

4. Father has exhibited repeated and continued incapacities that have caused Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and these incapacities cannot be remedied, which is grounds for termination under 23 Pa. C.S. §2511(a)(2).

5. Children have been removed from Father's care for a period of more than 12 months, the conditions which led to their removal and placement continue to exist, and termination would be in their best interests; thus, grounds for termination exist under 23 Pa. C.S. §2511(a)(8).

6. The termination of Father's parental rights will serve the developmental, physical, and emotional needs of the child as contemplated by 23 Pa. C.S. §2511(b).

## III. Discussion

It is a fundamental principle of American law, and one that has been affirmed by the highest court in the land, that all parents have a constitutionally protected right to the control, care and custody of their children. Santosky v. Kramer, 455 U.S. 745 (1982). However, this right is not absolute; "a parent's basic constitutional right to the custody and rearing of...his children is converted, upon the failure to fulfill...parental duties, to the children's right to have proper parenting and fulfillment of the child's potential in a permanent, healthy, safe environment." In re A.S., 11 A.3d 473, 478 (Pa. Super. 2010)

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

(internal citations omitted). In Pennsylvania, the starting point for this process is the Adoption Act, 23 Pa. C.S. §§2501 et seq., and any petition for the involuntary termination of parental rights brought thereunder must be based on one or more of the statutory grounds found at 23 Pa. C.S. §2511, which provides, in relevant part, as follows:

Section 2511. Grounds for involuntary termination

(a) General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement or the child continue to exist and termination of parental rights would serve the best needs and welfare of the child.
***

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described

26

therein which are first initiated subsequent to the giving of notice of the filing of the petition.

When considering this petition, the court must engage in a bifurcated analysis mirroring the order of the statutory provisions before parental rights may be terminated:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of the best interests of the child.

In re D.L.B., 166 A.3d 322, 326 (Pa. Super. 2017) (citing In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and convincing evidence is defined by the Superior Court as "evidence as that which is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (citing In re C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc)).

In other words, there are two separate, but nonetheless related, analyses that must take place when evaluating a petition for involuntary termination: first, the grounds for termination under 23 Pa. C.S. §2511(a), which must be proven by clear and convincing evidence; and second, as judged under a best interests standard, the termination must serve the needs and welfare of the child under Section 2511(b).

When considering grounds for termination under Section 2511(a)(2), we are bound by the longstanding test first enumerated by our Supreme Court in In re Geiger, 331 A.2d 172 (Pa. 1975) and restated in subsequent cases:

Three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re N.A.M., 33 A.3d 95, 100 (Pa. Super. 2011); see also In Interest of Lilley, 719 A.2d 327, 330 (Pa. Super. 1998).

Additionally, "the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." Matter of Adoption of M.A.B., 166 A.3d 434, 444 (Pa. Super. 2017) (citing In re A.L.D., 797 A.2d 326 (Pa. Super. 2002)). Further, parents are expected and required to make diligent efforts toward a reasonably prompt assumption of full responsibilities. A.L.D., supra, at 337.[5] Our Superior Court has also elaborated on the meaning of Section 2511(a)(2):

---

[5] CYS or any child welfare agency has a corresponding duty to "put forth a good faith effort in making services available to the parent," to facilitate reunification (unless a goal change motion has been granted), and this duty is "independent of the parent's duty to accept such efforts." In the Interest of C.K., 165 A.3d 935, 943 (Pa. Super. 2017) (citing In re J.J., 515 A.2d 883, 890 (Pa. 1986)). However, even in cases where the agency has not diligently made reasonable efforts toward reunification, the trial court may still grant a termination petition. In re D.C.D., 105 A.3d 662, 675 (Pa. 2014). Instead of denying the termination petition, the appropriate remedy is to "conclude on the record that the agency failed to make reasonable efforts, which imposes a financial penalty on the agency...under federal law." Id.

In the instant case, Mother made the argument in her Post-Trial Memorandum that CYS acted in a "dilatory" manner and failed to provide reunification services, which constituted an "extreme failure" on their part. See Mother's Post-Trial Memorandum at 4. While this Court notes that CYS did not facilitate social visitation between Mother and Children after September 2014 (later extended by the January 2015 Order of Court) and recognizes that temporal gaps existed in between the provision of various reunification services, based on the years' worth of counseling and other services extended to Parents, we do not find that CYS failed to make reasonable efforts for reunification prior to filing the Termination Petitions.

[Section 2511(a)(2)] does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in [Section 2511(a)(2)] should not be read to compel courts to ignore a child's need for a stable home and *strong, continuous parental ties*, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it...

In re E.A.P., 944 A.2d 79, 82 (Pa. Super. 2008) (emphasis in original).

Next, when evaluating grounds for termination under Section 2511(a)(8), " the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003). Termination under Section 2511(a)(8), notably, "does not require an evaluation of the parent's willingness or ability to remedy the conditions that led to placement of his or her children." M.A.B., *supra*, at 446; In re In the Interest of S.H., 879 A.2d 802, 807 (Pa. Super. 2005). Bearing great similarity to the Section 2511(b) analysis, the third element of the test under Section 2511(a)(8) merits particular mention, as it "focuses not on the parent's conduct, but on the children and their needs. The court must consider the needs and welfare of the children, including the presence of any parent-child emotional bond, which encompasses intangibles such as love, comfort, security, and stability." In re Adoption of R.J.S., 901 A.2d 502, 514 (Pa. Super. 2006).

For its part, the Section 2511(b) analysis requires the court to consider "intangibles such as love, comfort, security, and stability...when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond...[the] extent of the bond-effect analysis necessarily depends on the unique facts and circumstances of the particular case." M.A.B., supra, at 448 (internal citations omitted). Indeed, our Supreme Court has underscored the importance of performing a bonding analysis, even in those relationships where the connection between parent and child may be tenuous, dysfunctional or stagnated: "Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weight that injury against the damage that bond may cause if left intact." In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

However, although the parent-child bond is to be considered under Section 2511(b), "it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." In re Adoption of C.D.R., 111 A.3d 1212 (Pa. Super. 2015) (quoting N.A.M., supra, at 103). Besides the bonding analysis, "the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with a foster parent." A.S., supra, at 483. The Supreme Court has also noted that bonds with foster parents may be considered when performing an analysis under Section 2511(b): "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond

with their foster parents." <u>T.S.M.</u>, *supra*, at 268. In short, aside from evaluating the quality and effect of severing the bond between child and natural parent, a court, in accordance with the guidance set forth by precedent, may consider many factors when determining whether a termination meets the needs and welfare of the child pursuant to Section 2511(b).

Application as to Mother

CYS has petitioned that Mother's parental rights to Children be terminated pursuant to Section 2511(a)(2) and (8), each of which we will evaluate in conformity with the principles recited above.

First, with respect to Section 2511(a)(2), this Court concludes that CYS has presented clear and convincing evidence that Mother has displayed a repeated and continued incapacity for parenting that has left Children to be without essential parental care, control, or substance, the causes of which cannot be remedied. Specifically, Mother has displayed an emotional incapacity manifesting as an inability to empathize with and validate the feelings of Children which directly and negatively impacts their mental well-being.

From the case record, such a disconnect is clearly traceable to the parties' pre-placement circumstances. Prior to November 2013, it was observed by K.M.R. that Mother consistently "put blinders on" to Father's flagrantly destructive behavior, and the physical and emotional tolls it took on Children. Thus, even before the events directly triggering Children's placement, Mother was unable to empathize and lend herself as a source of emotional support during Father's bouts of abuse that even he conceded formed a significant share of the trauma Children endured. Once Children had been

taken into CYS care, and after they gained the ability and resources to work through the traumas of their past, Mother remained a cold or distant figure for them, as noted through the observations of no fewer than three professionals who worked with them. During his 2014 parental capacity assessment, and as recounted on the witness stand, Mr. Dick repeatedly noted the sheer lack of any emotional attachment between Mother and Children, exacerbated by her inability to put Children's needs ahead of her own. Mr. Dick further explained that Mother simply failed to appreciate the traumas Children had experienced, her part in them, and what she could do to repair the relationship moving forward.

Ms. Stahlman worked with Mother and Children, both in individual and in group therapy, to facilitate a "resolution" between the parties over the traumas they had all experienced and how to proceed moving forward to a healthy relationship based on trust and open communication. Ms. Stahlman conducted weekly therapy sessions for a period lasting nearly two years, from September 2015 to June 2017, which provided her with regular opportunities to observe how Mother interacted with Children. Although she remarked at several points during her testimony that Mother generally cooperated with the therapy sessions and even showed progress, Ms. Stahlman ultimately concluded that their work did not produce the hoped-for feelings of "love, connection, [and] attunement to feelings" between the parties, nor did it lead to Mother being able to independently display empathy with Children. Ms. Stahlman further noted that, besides getting defensive about her behavior, Mother made troubling statements during some sessions that downplayed or minimized or negatively compared Children's traumas (which at this point was known to include K.M.R.'s sexual abuse) to that of other children

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

in an apparent effort to encourage them to move on or "get past" what had happened. These statements clearly were contrary to the therapy sessions' goals of validation and acceptance of another's trauma, but supported Mother's focus on her own feelings at the expense, however unintentional, of her daughters.

Ms. Pieri, the CYS caseworker who had firsthand observations of Mother and Children since August 2016 supplemented by two-year's worth of her predecessor's notes, additionally relayed her impressions that no bond existed between Children and Mother. Also from this time is the "notice/demand" letter Mother sent to CYS in June 2017 in which she demanded the immediate return of not merely her children, whom she refused to call by name, but her "property." It is hard to imagine a greater emotional disassociation between a mother and her children than the characterization of her offspring as anonymous chattels.

In contrast to Mr. Dick, Ms. Stahlman, and Ms. Pieri, all of whom had months or years of personal experiences observing Mother and Children together, Dr. Gallo at no time witnessed Mother interact with Children when completing his January 2016 psychological evaluation of her. Thus, we accord less weight to any of his conclusions insofar as they pertain to the relationship between Mother and Children, and the reunification thereof. This is not to discount Mother's performance on the psychological tests he administered, but rather to emphasize the fact that Dr. Gallo's work is largely isolated from the remainder of the professionals in this case, all of whom were contracted through or an agent of CYS.

These realities of Mother's relationship with Children establish that the emotional separation began long before the parties came into contact with CYS in November 2013.

Since then, despite having several years to learn, reflect, and act on the suggestions for improvement provided to her by experienced professionals, Mother is no closer now than she was then to having a productive emotional relationship with her daughters. Mother's emotional incapacity is distinct when examined alongside other indicators of her ability to parent. As required of her under the law, Mother successfully complied with nearly all of the requirements of the FSP and showed she would be able to provide a materially appropriate home for Children if they were to be returned to her care. In contrast to other termination cases, in which a parent's compliance with a family service plan is minimal or nonexistent, Mother's willingness and ability to cooperate with many of the requirements merits commendation. Additionally, this Court is mindful of Mother's own history of trauma and abuse, and does not seek to minimize or discount what she has endured. However, these mitigating and sympathetic factors aside, we cannot look past Mother's lack of success and demonstrated inability at emotionally bonding with her daughters.

While a parent's duties certainly include providing a physical home and sustenance for his/her children, the duty does not end there. Our Supreme Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because the child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in child's life."

In re C.M.S., 832 A.2d 457, 462 (Pa. Super. 2003) (citing In re Burns, 379 A.2d 535 (Pa. 1977)).

At the present time, Mother demonstrates an inability to empathize and validate Children's feelings, and as a result would be unable to provide the love, guidance, and support a healthy parent-child relationship needs. Mother has certainly made modest efforts through therapy and other aspects of the FSP to rebuild these ties with Children but ultimately is unable, after years of work, to do so; Children cannot wait any longer for Mother to try. This Court "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." R.J.S., supra, at 513. Therefore, Mother's inability to remedy these issues, and provide the love and emotional support her daughters require for their present and future mental well-being, supports grounds for termination under Section 2511(a)(2).

CYS has also petitioned that Mother's parental rights be terminated pursuant to Section 2511(a)(8). As stated above, each analysis under Section 2511(a)(8) must examine whether CYS has presented clear and convincing evidence of three factors, as of the time of the petition: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best

serve the needs and welfare of the child. M.E.P., *supra*, at 1276. Because the length of time between Children's removal from the home in November 2013 and the filing of the Termination Petitions in April 2017 spans 41 months, the first factor is satisfied. The second factor, however, is unsatisfied because CYS has not adduced sufficient evidence demonstrating that the conditions which led to Children's removal continue to exist.

In contrast to Mother's emotional incapacity, which was only later developed as grounds for termination under Section 2511(a)(2), the conditions on Mother's part which led to Children's removal were the household's "deplorable" condition and her then-present inability to care for Children due to her hospitalization following Father's assault. Over the five years that have elapsed since Children's removal in November 2013, both of these conditions have abated and no longer exist. First, Mother was released from the hospital within several weeks of the assault and, although Children were by this time in CYS care and adjudicated dependent, was nonetheless physically able to provide care if Children had been released to her custody. Second, as relayed by both Mr. Dick in 2014 and Ms. Pieri in 2017, Mother had cleaned up her home, obtained new furnishings appropriate for Children, and secured working utilities, all of which indicated that the household was no longer in "deplorable" shape. While these steps forward were overshadowed by later developments and revelations, Mother nonetheless remedied both of the conditions that immediately triggered Children's removal from her care. This leaves the second factor under Section 2511(a)(8) unsatisfied, which in turn stops us from proceeding to the evaluation of the third factor. Accordingly, no grounds for the involuntary termination of Mother's parental rights exist under Section 2511(a)(8).

53RD
JUDICIAL
DISTRICT

AWRENCE COUNTY
PENNSYLVANIA

36

Now that grounds for termination have been established under Section 2511(a)(2), we proceed to the second stage of the bifurcated analysis, the needs and welfare analysis under Section 2511(b).

First, this Court will conduct the bond examination, which we are duty bound by ample precedent to perform. In re K.K.R.-S., 958 A.2d 529, 533 (Pa. Super. 2008). Upon reviewing the evidence, it is clear that Mother and Children's longstanding relationship notwithstanding, they share an unhealthy bond that suffers from a paucity of affection or meaningful positive connection. Prior to placement, Children and Mother had a strained relationship at best, periodically punctuated by Father's abusive episodes. Following placement, no fewer than three professionals who worked extensively with Mother and Children commented on the utter lack of positive feelings or genuine emotional bonds that are needed for a healthy upbringing: Mr. Dick described the relationship as "emotionally disconnected;" Ms. Stahlman plainly stated that Children "don't feel accepted, loved and attached" to Mother; and Ms. Pieri succinctly noted no bond or attachment existed between Mother and Children.

Behavior on the part of K.M.R. after social visits with Mother also speaks volumes to the unhealthiness of their bond, such as self-harm followed by an outright refusal to attend any more visits due to the toll the strained interactions took on her well-being. Moreover, K.M.R. herself stated that she has no feelings toward Mother, has no love for her, and would be content to never see her again. For J.L.A., it has been noted that her ability to communicate with Mother is "frozen and stagnant." On Mother's part, her position has wavered from her seeming commitment to the resolution and reunification process to referring to Children as "property." All the while, the bilateral relationship has

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

been marked by hurt feelings, instability, and lack of trust. In short, there is no salvageable bond between Mother and Children, and consequently, Children would not be harmed by the severance of that relationship.

By contrast, post-placement K.M.R. and J.L.A. have, by all measures, thrived with their long-term foster family. Since enrolling in the Mohawk School District, K.M.R. has made tremendous progress by achieving standout grades, joining student organizations (e.g. marching band and the spring musical), and making numerous friends. J.L.A. has also had academic success despite getting a later start at formal schooling than many of her peers. The foster parents have provided anything Children have needed, from clothes and food to homework help and transportation. For their part, Children have formed close-knit relationships with their foster family, to the point that their foster siblings became simply known to them as "brother and sister." At their foster and ostensibly pre-adoptive home, Children appear to be happy, safe, and loved. Therefore, this Court concludes that terminating Mother's parental rights would be in Children's best interests by meeting their needs and welfare as contemplated by Section 2511(b).

### Application as to Father

CYS has petitioned that Father's parental rights to Children be terminated pursuant to Section 2511(a)(2) and (8), each of which we will again evaluate in conformity with the principles recited above.

With respect to Section 2511(a)(2), CYS has demonstrated by clear and convincing evidence that Father has exhibited a repeated and continued incapacity for parenting that has caused Children to be without essential parental care, control or subsistence that cannot and will not be remedied. Unlike Mother, whose parental

incapacity primarily revolved around emotional issues, Father's incapacities encompass the provision of housing, food, guidance, and emotional support. Prior to placement, Father drifted in and out of Children's lives, leaving the primary responsibility for their upbringing to Mother. When Father did reemerge into Children's lives, his appearances were accompanied by heavy drinking, and later drug usage, as well as physical and emotional abuse directed at Mother and K.M.R. in particular. It was Father's drug-fueled outburst on November 2, 2013 that directly triggered Children's placement with CYS as the police response to his assault uncovered Mother's "deplorable" home and landed him in the Lawrence County Correctional Facility pending disposition of the case.

Aside from a few gaps, Father generally spent the time between November 2013 and January 2017 either in jail or under some type of court-supervision, which made him further unavailable to comply with the FSP or focus on providing an appropriate home for Children. Once released in January 2017, Father still demonstrated some difficulty in working with CYS and completing portions of the FSP, such as finishing a parenting class and attending a batterer's group. Additionally, Father lacked a fixed address or suitable housing for Children. Father has had contact with Children since they were taken into CYS care, through the social visits between September 2015 and February 2016, and his therapeutic sessions with K.M.R. in the spring of 2017. However, these interactions, particularly the therapeutic visits, revealed his emotional ties with Children were just as frayed as Mother's. As relayed by Ms. Stahlman, J.L.A. refused to attend these visits altogether while K.M.R. primarily attended to feel a sense of resolution that would then enable her to move forward without any relationship to Father. While Father has also taken modest steps to comply with the FSP and work toward reunification, once

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

39

again this Court cannot endlessly wait for Father to mature to the point where he can provide a stable, loving home for Children. See In re D.J.S., 737 A.2d 283 (Pa. Super. 1999).

In sum, Father's actions with respect to Children prior to placement showed a lack of capacity to parent that partially resulted in Children being left without essential parental care, control and subsistence, and his actions post-placement have reinforced this incapacity. Father is presently without adequate income, housing, or other means to provide for Children, lacks an emotional relationship to them partly attributable to previous abuse, has not fully complied with the FSP, and has had repeated run-ins with the criminal justice system. These delays and distractions on his part have hampered Father's affirmative duty to work toward reunification. Taken together, these facts show that Father cannot and will not be able to remedy his incapacity to parent Children, and thus grounds for termination exist under Section 2511(a)(2).

Next, with respect to Section 2511(a)(8), CYS presented clear and convincing evidence that termination is warranted on this ground. Once more, the three factors that must exist for granting termination under this subsection are: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. M.E.P., supra, at 1276. As noted above, the first factor is easily met. Children were taken into CYS care in November 2013 and the Termination Petition was not filed until April 2017, a span of 41 months.

For the second factor, it is apparent that conditions on Father's part that led to Children's removal or placement continue to exist. Indeed, Father played a large part in creating the conditions leading to Children's removal in November 2013. At that time, in addition to lacking a stable residence for Children when they were not with Mother, Father was heavily abusing drugs and alcohol, the overindulgence of which factored into the brutal assault that prompted the response of the Pennsylvania State Police. Over five years later, Father's situation has changed somewhat but not enough to defeat termination. As before, Father lacks proper accommodations for Children. While Father has not used some drugs since that time, such as heroin or cocaine, Father still engages in risky behavior that has occasionally landed him in jail, such as allegedly driving under the influence and stealing retail goods, and further fails to signal a present ability to take Children into his care. Moreover, Father has not improved in his capacity to be an emotionally supportive parent to his daughters. Although Father has made some progress post-placement, these efforts are a case of too little, too late for purposes of remedying the conditions that led to Children's placement.

For the third element under subsection (8), we will engage in an analysis nearly identical to that forthcoming under Section 2511(b). It is evident to this Court that there is no healthy bond between Father and Children, and that their needs and welfare are met by their foster family. Prior to placement, Children saw Father on an itinerant basis, insufficient to create the strong and lasting ties needed for a long-term relationship. When Father was around, he was frequently under the influence of drugs or alcohol, which further precluded Children from getting to know him in a meaningful and positive way. Additionally, we cannot ignore the fact that Father played a significant

role in the trauma Children experienced because they suffered or witnessed the emotional and physical abuse he inflicted and how this inevitably impacted their relationships. Father's ability to bond with his daughters post-placement was equally unsuccessful. This period was marked by curtailed visitation due to stays in jail and therapeutic visits that proved taxing for K.M.R. while J.L.A. refused to participate outright. Ms. Stahlman and Ms. Pieri, two professionals who spent considerable time working with Father and Children, additionally observed the lack of any bond between them. In short, to the extent that any bond exists between Children and Father, it is irreparably damaged as a result of years of negative and dysfunctional interactions. Therefore, Children would not be harmed by the severance of this relationship.

As thoroughly recounted above, Children's tenure with their long-term foster family has been, by contrast, one of relative stability and tranquility. Children have bonded quite well with their foster family and become thoroughly assimilated. Living with their foster family has given Children access to educational opportunities and social outlets, and a sense of physical as well as emotional safety and security, that they never knew with Father. Shortly put, Children's foster family has proved themselves more than capable of meeting their needs and welfare, and this Court concludes that it is in their best interest to remain there. Accordingly, CYS has satisfied all three elements under Section 2511(a)(8) for terminating Father's parental rights on these grounds.

Our analysis under Section 2511(b) is nearly identical to the third prong under Section 2511(a)(8), and we will simply reiterate what has already been set forth. Father lacks any significant bond with Children attributable to years of abusive and negative behavior including significant absences from their lives. Children, for their part, feel no

affection toward Father and generally wish to see him as little as possible. They appear ready to move on from their relationship with Father and all of the difficult emotions that have accompanied it. Thus, to the extent any bond exists between Children and Father, its severance would not detrimentally impact Children.

Lastly, it is well-documented that Children's foster family has been able to meet their needs and welfare. Over the five years of Children's stay, they have formed immeasurable bonds with their foster family and feel comfortable, safe, and secure in their care. Therefore, this Court concludes that Children remaining in their foster parents' care would be in their best interests.

In conclusion, CYS has presented clear and convincing evidence that Mother's and Father's parental rights to Children should be terminated pursuant to the proper statutory grounds, and that termination would be in their best interest. It is never an easy decision to permanently and unequivocally terminate a parent's right to his/her child, and it is a decision that is only reached after painstaking examination of the evidence as applied to the law. This case has only reached the final decision stage after years of winding its way through the permanency review hearings and pre-termination process. The complex factual and procedural history notwithstanding, it is apparent to this Court that Children have no meaningfully positive relationships with either Mother or Father, that neither parent is fully able or equipped to provide the appropriate home or emotional support Children need, and that Children's best interests are served by maintaining their placement with their foster (and presumptively pre-adoptive) family. Accordingly, the Court enters the following order.

53RD
JUDICIAL
DISTRICT

LWRENCE COUNTY
PENNSYLVANIA

IN THE INTEREST OF:                    : IN THE COURT OF COMMON PLEAS

                                       : LAWRENCE COUNTY, PENNSYLVANIA

K.M.R.                                 : NO. 94 OF 2013, DP;
                                         NO. 20012 of 2017, OC-A

J.L.A.                                 : NO. 95 OF 2013, DP;
                                         NO. 20011 of 2017, OC-A


## ORDER OF COURT

AND NOW, this _16th_ day of January 2019, having reviewed the evidence presented by all parties regarding the Involuntary Terminations of Parental Rights and Motion for Goal Change, the Court hereby ORDERS and DECREES as follows:

1. CYS' Motion for Goal Change from reunification to adoption is GRANTED.

2. CYS has demonstrated by clear and convincing evidence that grounds for the involuntary termination of Mother's parental rights exist pursuant to 23 Pa. C.S. §2511(a)(2).

3. CYS has demonstrated by clear and convincing evidence that grounds for the involuntary termination of Father's parental rights exist pursuant to 23 Pa. C.S. §2511(a)(2) and (8).

4. CYS has also demonstrated that Children's needs and well-being would be best served by termination of their parents' rights as contemplated by 23 Pa. C.S. §2511(b)

5. Mother's parental rights to K.M.R. and J.L.A. are hereby TERMINATED.

6. Father's parental rights to K.M.R. and J.L.A. are hereby TERMINATED.

FILED/ORIGINAL 2019 JAN 16 PH 3: 21

JODI KLABON-ESOLDO
PRO AND CLERK

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

44

7. Custody of K.M.R. and J.L.A. shall remain with CYS, which shall now have the right to proceed with the appropriate filings for the adoptions of Children by their foster family without further notice to or consent of Mother or Father.

8. The Prothonotary of Lawrence County is directed to serve notice of this order to the counsel of record for all parties, or if not represented by counsel, to the party's last known address.

FOR THE COURT:

_____, J.

John W. Hodge, Judge

FILED/ORIGINAL

2019 JAN 16 PM 3:21

JODI KLABON-ESOLDO
PROAND CLERK

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

45



Certified from the record
NEW CASTLE - LAWRENCE
COUNTY PENNSYLVANIA

MAR - 7 2019